# EXHIBIT C



**CONSORTRA**
TRANSLATIONS

24th November 2022

To whom it may concern,

I, Anne Fort, a qualified and experienced translator, hereby certify that to the best of my knowledge the document attached to this letter ("*Submissions on Interim Measures*"), originally written in French, is a true and accurate translation into English.

If there is any further information we can provide you with, please do not hesitate to contact us.

Yours sincerely,

Anne Fort

BA (Hons) in French and Spanish from the University of Exeter.
Post-Graduate Diploma in Translation from the Polytechnic of Central London.
Member of the Institute of Translation and Interpreting.
Member of the Chartered Institute of Linguists.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

---

**SUBMISSIONS
ON INTERIM MEASURES**

---

FOR:

**Ms Clara MOUSSA, wife of Mr BOUSTANY, hereinafter referred to as Clara MOUSSA**

Represented by Maître Sarah FILIPPI

AGAINST:

**Mr Fadi BOUSTANY**

Represented by Maître Christine PASQUIER-CIULLA

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

**MAY IT PLEASE THE CONCILIATION JUDGE**

## I. Facts and proceedings

In April 2005, Dania BOUSTANY introduced her brother, Fadi BOUSTANY, born on ███████ 1967 in Dibbiyeh, Lebanon, of Swiss-Lebanese nationality, who lived in Monaco at the time, to Clara MOUSSA, born on ███████ 1974 in Deir al-Kamar (Lebanon), of Franco-Lebanese nationality.

Clara MOUSSA was then a Lebanese national, a young graduate in economic studies with an MBA. During that period, she was working in her father's company as a director.

The couple often met during Clara MOUOSSA's stays in the south of France, where her parents live, and during holidays.

During one weekend in Paris, in June 2005, Fadi BOUSTANY asked Clara MOUSSA to marry him. She accepted his proposal.

He reconsidered his proposal almost immediately, saying that he needed a period of reflection.

In September 2005, he returned to Lebanon and asked to see Clara MOUSSA again in a church. He then told her that he was suffering from multiple sclerosis which, according to him, had been diagnosed in the summer. He asked her to marry him nonetheless.

Despite the shock of the announcement and of its consequences for the future, Clara MOUSSA accepted his proposal and left her country of origin to go and live in Monaco with Fadi BOUSTANY in April 2006, in an apartment situated in the Patio Palace.

Their marriage took place before the registrar of Monaco, on 11 November 2006, under the legal system of separation of property, in the absence of a prenuptial agreement, in strict privacy (11 guests), at the husband's request.

Three children were born from that marriage, thanks to a medical protocol and in particular after several trying IVF attempts:

- ❖ ████, born on ███████ 2007 in Nice, France, of Lebanese and Swiss nationality;
- ❖ ████, born on ███████ 2013 in Nice, France, of Lebanese and Swiss nationality;
- ❖ ████l, born on ███████ 2013 in Nice, France, of Lebanese and Swiss nationality.

In September 2010, the couple moved to an apartment in the Métropole Residence made available to them free of charge by the SCI DU METROPOLE.

In 2013, for the birth of the twins, works were undertaken to join a duplex to their original accommodation.

The family has lived there since then.

Family life has always been dictated by Fadi BOUSTANY's illness, the family having dealt with and suffered the deterioration in his health together.

Since 2018-2019, Clara MOUSSA has noticed a change in her husband's behaviour, which she is unable to do anything about. He has become more aggressive, having mood swings, sometimes talking incoherently, making unfounded criticisms of her which she has attributed to his illness.

During this same period, taking into account Fadi BOUSTANY's loss of independence, his sister (with whom he had been involved in a dispute since the death of their father in 2009) and his mother have been present in all aspects of his daily life.

Clara MOUSSA has, nevertheless, done everything to continue to support her husband and carry on family activities and trips with him, despite the rapid development of his illness, which has left him paralysed to a 98% degree.

It is in this distressing context that, on 28 April 2022, Fadi BOUSTANY's Swiss lawyer sent Clara MOUSSA a letter informing her of his wish to divorce her, then favouring a mutual agreement.

> ➢ *Exhibit 1: letter from Maître BONNANT to Clara MOUSSA dated 28 April 2022*

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

Astonished at the content of that letter, Clara MOUSSA did not fail to question her husband, who immediately reassured her and asked her not to take any notice of it.

She then sent a letter to that effect to her husband's lawyer, who hastened to dispute what Fadi BOUSTANY had said and confirm his intention to divorce her, asking her to contact a lawyer with a view to making an "*appointment*".

> ➢ *Exhibit 2: letter from Clara BOUSTANY to Maître BONNANT dated 16 May 2022*
> ➢ *Exhibit 3: letter from Maitre BONNANT to Clara BOUSTANY dated 3 June 2022*

Clara BOUSTANY complied.

At the same time, she nevertheless noted that her husband was refusing to communicate with her almost at all, being happy to send her electronic messages, but he was also refusing any family activities.

Gradually, Fadi BOUSTANY thus imposed a division of rights to the children, even though they hardly understood the situation at all and saw their mother suddenly excluded from their family life.

During the holidays in early November, he allowed the children to go to New York with their mother for the first part, to join him later, for the second part, on a trip to the south of France planned from Saturday 29 October 2022.

A few hours after Clara MOUSSA had left with her children, when her husband had refused any direct communication for many weeks, he called her to tell her that he would file an application for divorce while she was away, considering that the amicable discussions had not proved successful.

According to the application dated 26 October 2022, Fadi BOUSTANY requested authorization to summon his wife to a conciliation hearing and in the meantime to live alone in the marital home, stating that his wife had adopted "**pernicious and particularly shocking behaviour**", proposing nevertheless to put her up in a 5-room apartment in the "Florestan" residence.

According to the Presidential Order issued that same day, it was authorized, Clara BOUSTANY being ordered not to disturb him.

On that same date, and as agreed between the Parties, the children left New York to join their father.

Clara MOUSSA stayed in New York, having to attend a charity gala on 3 November.

Clara MOUSSA then had no knowledge of the Presidential Order.

Through her lawyer, she requested a copy on 27 October 2022, recalling that she was not in the Principality.

> ➢ *Exhibit 4: letter from Clara MOUSSA's lawyer to Fadi BOUSTANY's lawyer dated 27 October 2022*

In the evening of Friday 28 October 2022, Fadi BOUSTANY changed the locks to the marital home, under the eyes of his children, causing them to panic. The latter immediately informed their mother.

The operation took several hours before the father and children left on holiday and while the persons involved were perfectly aware that Clara BOUSTANY was thousands of kilometres away.

Such an operation could have, and should have, been organized when the children were not present, all the more so since, in the meantime, the Métropole security could have prevented Clara BOUSTANY from entering the residence.

> ➢ *Exhibit 5: photograph of the locksmith working at the marital home*

On 31 October 2022, Fadi BOUSTANY regularly summoned his wife to the conciliation hearing fixed for 16 November 2022.

Clara MOUSSA made arrangements to return to Monaco early.

She stated, through her lawyer, that she intended to see her children on her arrival and, while looking for new accommodation, she and her children would be staying with a friend.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

➢   *Exhibit 6: email from Clara MOUSSA's lawyer to Fadi BOUSTANY's lawyer dated 1 November 2022*

According to an official letter dated 2 November 2022, Fadi BOUSTANY's lawyer informed her that "*the lease discussed on the Florestan apartment could not be arranged*", contrary to what had been announced at the hearing on 26 October 2022, but he proposed to accommodate his wife (without the children ?) at the Hôtel Méridien until the conciliation hearing, before she could move into an apartment made available to her in the Patio Palace.

Fadi BOUSTANY took care to point out that the children could see their mother from time to time, provided that she undertook not to "*dramatize the situation*".

Fadi BOUSTANY also stated that alternate residence could then be contemplated.

➢   *Exhibit 7: letter in response from Fadi BOUSTANY's lawyer to Clara MOUSSA's lawyer dated 2 November 2022*

A reply was sent to Fadi BOUSTANY's lawyer, informing him that Clara MOUSSA would temporarily live with a friend who was able to accommodate her children.

➢   *Exhibit 8: email from Clara MOUSSA's lawyer to Fadi BOUSTANY's lawyer dated 2 November 2022*

In actual fact, the children spontaneously wanted to stay with their mother, in an apartment which they were already familiar with, the host being a close friend of Clara MOUSSA's, who was absent from the Principality.

The father raised no objection to that.

➢   *Exhibit 9: SMS exchanged between Clara and Fadi BOUSTANY commencing on 2 November 2002*

On 3 November 2022, Fadi BOUSTANY informed her in particular in writing through his lawyer that it was appropriate to "offer [him] visiting rights while awaiting the conciliation hearing".

He recalled his wish to rehouse Clara MOUSSA and the children in the Patio Palace residence and his wish for the children to remain in his home and that he was not obliging them to live with strangers.

➢   *Exhibit 10: letter from Fadi BOUSTANY's lawyer to Clara MOUSSA's lawyer dated 3 November 2022*

So as not to exploit justice by multiplying the official letters, Clara MOUSSA preferred to maintain direct communication with the children's father as far as possible.

The Parties thus reached an agreement over the division of their rights, the children having chosen to remain with their mother.

➢   *Exhibit 9: SMS exchange between Fadi BOUSTANY and Clara MOUSSA commencing on 2 November 2002*

On 11 November 2022, Clara MOUSSA arranged for an email to be sent to her husband's lawyer, telling him that there would be no question of his imposing her new living place on her in any way.

She thus made visits to arrange her new accommodation with the three children, which involved a budget of €650,000 (rent, guarantees, deposit, furnishings and running costs).

➢   *Exhibit 11: letter from Clara MOUSSA's lawyer to BOUSTANY's lawyer dated 11 November 2022*

At the same time as sending that letter, Fadi BOUSTANY's lawyer declared that he would be unable to attend the conciliation hearing on 16 November and that he would need to request an adjournment.

In the meantime, he nonetheless expected his wife's rehousing and the rights relating to the children to be settled.

➢   *Exhibit 12: letter from Fadi BOUSTANY's lawyer to Clara MOUSSA's lawyer dated 11 November 2022*

4

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

To support his letter, Fadi BOUSTANY filed documents on extremely interim measures, requesting:

❖ If Clara MOUSSA accepted the offer to rehouse her in the Patio Palace, to note Fadi BOUSTANY's proposal to introduce alternate residence and, failing that, to fix the children's residence at their mother's home with visiting and accommodation rights granted to their father every other weekend from Friday to Monday and at the end of the school day on Wednesday up till 18:00 as well as for Fathers' Day and half the school holidays alternating each year.

❖ If she refused the rehousing offer, that the children's residence be fixed at their father's home with visiting rights granted to their mother every other weekend from Friday to Monday and at the end of the school day on Wednesday up till 18:00 as well as for Mothers' Day and half the school holidays alternating each year.

On receiving that letter, Clara MOUSSA firstly recalled the urgency of obtaining a ruling on all the interim measures and, secondly, that an agreement be reached concerning the children.

➢ *Exhibit 13: letter from Clara MOUSSA's lawyer to BOUSTANY's lawyer dated 12 November 2022*

In reply, Fadi BOUSTANY maintained, through his lawyer, that no agreement had been reached but that, on the contrary, Clara MOUSSA had arbitrarily decided to keep the children with her.

➢ *Exhibit 14: letter from Fadi BOUSTANY's lawyer to Clara MOUSSA's lawyer dated 12 November 2022*

Clara MOUSSA disagreed.

➢ *Exhibit 15: letter from Clara MOUSSA's lawyer to BOUSTANY's lawyer dated 14 November 2022 regarding the rehousing of the children*

Even so, not backing down on anything, Fadi BOUSTANY did not hesitate, to force his wife to submit to his demands regarding her housing, to try and hand over the keys to the apartment that he had assigned to her, as from 14 November 2022, that is, just two days prior to the conciliation hearing, through a bailiff who appeared at my office.

➢ *Exhibit 16: letter from Clara MOUSSA's lawyer to BOUSTANY's lawyer dated 14 November 2022* regarding the handover of keys to Patio Palace

Moreover, as from 11 November 2022, Mr Fadi BOUSTANY filed submissions containing requests for extremely urgent measures regarding the pleading party's accommodation and measures concerning the children.

## II. <u>On the claims for extremely urgent measures</u>

It should be noted that, although the provisions of article 202-1 of the Civil Code state that it is up to the Conciliation Judge to rule on the spouses' requests for interim measures, having to rule on their relations during the divorce proceedings, there is no legal or procedural provision that provides for the Judge's power to take "*extremely interim*" measures.

The extremely interim measures requested by the husband, in fact, simply aim to avoid, at this stage, any discussion regarding the spouses' financial situation and examination of the exhibits relating thereto.

This procedure is not acceptable in view of the spouses' situation and the family's living conditions.

It is noted that the urgency in this case is established for all the requests made by Clara MOUSSA, who, on account of her husband's procedural conduct, has found herself with no home or money, with her three children to look after, while Fadi BOUSTANY, who has exceptional financial means, at the same time, is living alone in an apartment of 410m2 from which he has evicted his family.

As things stand, the Conciliation Judge cannot rule on Clara MOUSSA's accommodation without, just as urgently, ruling on Mr Fadi BOUSTANY's obligations to provide food and money for his family.

Such is the urgency of the case that Ms Clara MOUSSA is seeking a ruling on all her claims.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

### III. On the interim measures

Firstly, although this point does not fall within the competence of the Conciliation Judge, Clara MOUSSA is categorically disputing the maltreatment that she is accused of.

She can only regret that her husband, who had initially wanted to initiate consensual proceedings, suddenly made the clearly strategic choice of particularly harsh proceedings in their place, going as far as evicting her from the marital home.

In order to do so, Fadi BOUSTANY produced four statements made by his employees or former employees which must be assessed with the greatest reservation as they are not corroborated by any objective evidence and the authors bear a clear resentment to Clara MOUSSA's position, as employer.

Marco LIBERI, a former employee of Fadi BOUSTANY's and currently working for his family, reports an episode, disputed by Clara MOUSSA, that allegedly took place in October 2008 (other party's exhibit 4), that is, no less than 12 years before the proceedings were brought.

Séverine GUERIN, employed in 2016 (and during the summer of 2018) reports an episode, also disputed by Clara MOUSSA, that allegedly took place "*one morning*", during which the latter allegedly sprayed the marital bed with a "*deodorant*" (other party's exhibit 5).

The testimony provided by Audrey GIL, employed for six months in 2016, has more of the appearance of grievances within the scope of a social file, complaining that her employer did not like the soup she had prepared. The consequences of her statements are inversely proportional to the seriousness of her accusations (other party's exhibit 6).

Léonie CITERNE, who does not even give the dates of when she worked for the BOUSTANY family, declares the wife's "lack of involvement" (other party's exhibit 7).

It should be noted that Clara MOUSSA had requested that employee's dismissal on the ground that she had adopted particularly indecent behaviour while at her place of work, posting on an open social network photos of her half naked taken in the family home, in their holiday place and sometimes even on her employers' bed.

> ➢ *Exhibit 17: bailiff's official report on Léonie's Instagram account*
> ➢ *Exhibit 18: SMS exchange between Fadi BOUSTANY and Clara MOUSSA regarding Léonie and free translation*

Clearly, no maltreatment can be deduced from his testimony of convenience, particularly as they report alleged **facts dating back several years**, drawn up in June 2022, that is, 6 months prior to the filing of the request when Fadi BOUSTANY said that he wished to proceed by mutual agreement.

They also totally contradict the testimony obtained by Clara MOUSSA which demonstrates her total devotion.

- *Exhibit 19: Statement made by Nisrine KARAGULLA dated 9 November 2022*
- *Exhibit 20: Statement made by Bernard MOUSSA dated 8 November 2022*

Clara MOUSSA will not fail to demonstrate the ill-founded nature of the aforesaid accusations and the unconditional love she has always shown for her husband and she reserves the right to bring the necessary criminal proceedings for false testimony.

At this stage, Clara MOUSSA is forced to request the following interim measures.

### §1. Accommodation

By order of 26 October 2022, the President of the Court of First Instance immediately authorized Fadi BOUSTANY to live alone in the marital home, ordering Clara MOUSSA not to disturb him there.

To obtain such a measure, Fadi BOUSTANY informed the Judge that he was on the point of arranging a lease to immediately rehouse his wife in the Le Florestan building.

This intention was only corroborated by an extract from the lease on the aforesaid property accessible on the website of a property agency.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

No document demonstrating any measures taken by Fadi BOUSTANY to reserve that apartment for his wife has been produced in the proceedings.

For unexplained and inexplicable reasons (but which may relate simply to the fact that no measure has ever been taken), the Florestan lease "could not be arranged".

Clara MOUSSA was evicted from the marital home according to the Order of 26 October 2022.

Unable to get back into her home following her holiday, she found herself without accommodation, with her suitcase, and she urgently had to arrange her accommodation, her husband only having offered to make a suite available to her at the Hôtel Méridien in which she would have been unable to accommodate her children.

Moreover, this offer was only made on 2 November (exhibit 7), when questioned by Clara MOUSSA's lawyer, and when she had already returned to Monaco and had no place to live.

Fadi BOUSTANY also proposed accommodating the pleading party in the 5-room apartment in Patio Palace as from 14 November 2022, that is, 19 days after filing the application for divorce, under whose terms he assured the Judge that he would find accommodation for his wife.

> ➢ *Exhibits 8 and 9: official letters from Fadi BOUSTANY's lawyer to Clara MOUSSA's lawyer dated 2 and 3 November 2022*

This "offer" was taken particularly badly by Clara MOUSSA who had told her husband, for years, that she did not wish to go back to living in that building.

> ➢ *Exhibits 21: SMS exchange between Clara and Fadi BOUSTANY concerning a move to the Patio*

In fact, in 2020, Fadi BOUSTANY, who was then complaining about living at his place of work, had already made the request to return to the Patio Palace, to the accommodation he is now offering his wife.

At that time, the couple were already compromised by Fadi BOUSTANY's state of health, his mood swings, and his increasing contempt for his wife.

The latter cannot resign herself to imagining that her husband then had the idea of making the family move into a far more modest apartment (which was too small to accommodate the family that had two more children but also a nanny and domestic staff), in view of a separation that he was already premeditating.

In any event, it should be noted that, aware that that accommodation did not meet the family's needs, he himself abandoned that plan and kept his family in the Métropole residence.

Beyond that legitimate fear, it is clear that Clara MOUSSA had justified her unease about returning to that accommodation, where she had suffered the full force of the first serious symptoms of her husband's illness, his first falls, the first aid to be given to him, the first signs of his loss of independence.

She was then nervous and most astonished at Fadi BOUSTANY's wish to impose it upon her, two years later, in a judicial context.

Fadi BOUSTANY justified his choice by the fact that ▮▮, the couple's eldest child, had already lived there.

The couple had moved in September 2010, when ▮▮ was not even three years old. She therefore has no memory of that accommodation.

Even assuming that she had, they might be as unpleasant as her mother's.

The argument is therefore totally inapplicable.

Whatever the case may be, Clara MOUSSA cannot accept her husband's offer for clear, underlying reasons.

In fact, the apartment, which belongs to one of her husband's companies, is situated on the same landing as those occupied by members of the BOUSTANY family (and, in particular, by the latter's cousin), which has not failed to show its hostility towards Clara MOUSSA, even before the filing of these proceedings.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

It would therefore be particularly awkward for her (but also for the children) to have people harbouring such animosity as their immediate neighbours.

The proposal appears to be all the more indecent as the accommodation does not correspond to the standing to which the family has been accustomed for 12 years in any way.

The family had, in fact left the Patio Palace apartment when they had only one child, having already considered that it no longer suited their needs.

The family had then moved to another extremely luxurious apartment situated in the Métropole Residence, with not less than 410 m2, in the most prestigious district of the Principality.

Besides the luxury of the accommodation, this apartment offers hotel services that have enabled the family to live in immeasurable and exceptional comfort.

Mr BOUSTANY now lives alone there.

It costs more than €100,000 per month to rent that accommodation, excluding service costs of several tens of thousands of euros.

> ➤ *Exhibit 22: Lease on "Résidence du Métropole" for an apartment equivalent to the apartment attributed to Fadi BOUSTANY with an annual rent of around €1,100,000*

It is inappropriate for Fadi BOUSTANY to offer to house his wife, his three children and their nanny in an apartment half the size with a rental value of one-fifth of the rental value of the accommodation he now occupies alone with his employees.

This situation would be all the more unfair as the couple's children will continue to benefit from that accommodation when they are with their father.

The children must therefore have equivalent accommodation when they are with their mother, so that their lifestyle and their comfort are maintained, as far as possible.

The procedure implemented cannot in any event take place disregarding the right to respect for their private and family life which guarantees the fundamental right for each one to choose his living space.

It is neither fair nor reasonable for Fadi BOUSTANY, who has the use of the marital home, and who has already excluded his wife from it, to now wish to unilaterally require her (and their children) to live in an apartment which he himself has had renovated and furnished in which the family will never be able to feel "at home".

It is perfectly legitimate for Clara MOUSSA to want to be able to choose, with her children, who are 9 and almost 15 years old, the place where they will be living for an indefinite period, but which one fears may be for several years.

It is therefore particularly regrettable that Fadi BOUSTANY wishes to impose on his wife her future accommodation without even contemplating any other solution, or the slightest consideration for his family's feelings and the interests of the children.

It is indisputable that, by forcing his wife to move to the Patio, 48 hours before the conciliation hearing, through the intervention of a bailiff, Fadi BOUSTANY is simply trying to reduce the maintenance obligations that will inevitably be imposed on him by the Conciliation Judge as far as possible.

For her part, in order to compensate for Fadi BOUSTANY's arbitrary choice, Clara MOUSSA has arranged several visits with the children which have led them to retain a property where they have managed to make plans.

Clara BOUSTANY has thus produced a rental offer which might suit her and the children on an apartment in the "Balmoral" residence with a monthly rent of €80,000.

> ➤ *Exhibit 23: Rental offer on the "Balmoral" apartment and technical data sheet on the property.*

The costs of renting the accommodation will amount to €650,000, broken down as follows:

- €210,000.00 by way of guarantee deposit
- €210,000.00 by way of payment of rent and expenses for the period from 21 November 2022 to 21 February 2023
- €1,500.00 by way of bailiff's and inventory fees
- €84,000.00 by way of agency fees

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

- €16,800.00 by way of VAT on agency fees
- €126,000 by way of furnishings

➢ *Exhibit 24: Tania Architecture furnishings estimate*

To these expenses, one should also add the costs of purchasing a dishwasher, household linen and, in general, all items required for the everyday life of a family with three children.
Fadi BOUSTANY should consequently be ordered to pay Clara MOUSSA the sum of €650,000 based on his responsibility for maintenance, to enable her to find accommodation, the amount having to be paid to her as from the decision to be pronounced, which shall be immediately enforceable.

## §2. The measures regarding the children

### A. Parental authority

The parents will jointly exercise parental authority and will have to take the important decisions concerning the children together.

In this respect, it should be pointed out that the parents are now in direct communication in view of the choice of a child psychiatrist to best maintain the children's stability, despite their parents' sudden separation.

### B. The children's residence

Fadi BOUSTANY is not afraid of requesting the establishment of alternate residence, according to the terms of his documents, in the first place, only if Clara MOUSSA agrees to his proposal for her to move to the Patio PALACE.

Aware of the provisions of article 303-3 of the Civil Code, which prohibit alternate residence in the absence of both parents' consent, he proposes that, failing that, their residence be fixed at the mother's home with so-called "standard" visiting and accommodation rights in his favour.

If, on the other hand, Clara MOUSSA refuses the sole offer of accommodation made to her by her husband, Fadi BOUSTANY believes he must ask for the children's residence to be fixed at his home and for the establishment of a standard visiting and accommodation right in favour of the pleading party.

Consequently, either Clara MOUSSA agrees to be subject to a state of dependence imposed by her husband and Fadi BOUSTANY agrees to the children's residence being fixed with her, or she refuses it and exposes herself, in retaliation, to his taking all measures to ensure that the children's residence is fixed with him, with a visiting and accommodation right reduced to 6 nights a month for the mother.

This position reveals the pressure suffered by the pleading party during the course of the marriage, and Fadi BOUSTANY's wish to maintain control over her life, particularly by forcing her to live in the apartment that he decides to assign to her.

The children's residence cannot be made subject to their mother's acceptance or refusal of the accommodation proposed by the father, while the latter has all the financial means to assume the payment of a rent corresponding to accommodation in keeping with the children's lifestyle.

It must be fixed in the sole superior interest of the children, with the parent more able to take everyday care of them, and take care of their physical and mental health and safety.

In this particular case, Clara MOUSSA objects to the establishment of an alternate residence, as that is not in the interests of children aged 9 and 14 years.

She requests that the children's residence, as requested by Fadi BOUSTANY were she to accept his proposed accommodation, be fixed at the mother's home.

It should be pointed out that this proposal made by Fadi BOUSTANY expressly recognizes the fact that Clara MOUSSA is perfectly able to take care of the three children, as she has always done.

Owing to his position, Fadi BOUSTANY implicitly recognizes that he is unable himself to take charge of the three children every day, particularly on account of his state of health.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

In fact, Fadi BOUSTANY has unfortunately lost all independence and requires paramedical assistance himself from professionals who care for him in shifts by day and night.

He cannot in any way care for children just 9 years of age <u>without the constant assistance of a third party</u>.

His illness in any event causes him particular stress and makes it difficult for him to deal with everyday life.

It would not therefore make any sense to order an alternate residence that would cause the children to be taken care of every other week by professionals and not by a perfectly available and devoted parent.

For the exact same reasons, Clara MOUSSA considers that the children's residence must be fixed at her home.

Fadi BOUSTANY seems (regardless of the blackmail threatened) to recognize that it is in the children's interest to stay with their mother since, failing an alternate residence, he is proposing that their residence be effectively fixed at their mother's home.

Fadi BOUSTANY knows that Clara MOUSSA has had to take care of the couple's three children alone almost since they were born.

She has always assumed her role as mother with affection and attention, which is not questioned by Fadi BOUSTANY in any way.

Today she represents the only reassuring reference point for the children who need her in their everyday lives, as she has dealt with all their medical appointments, school meetings and child monitoring in every field, including sports. In view of their father's state of health, she has accompanied the children on her own more often than not both in their schooling and in their extra-curricular activities, sending photos of the children's various activities almost daily to their father to integrate him into the family life in every way possible.

> ➤ *Exhibit 25: screenshot of photos of the children sent by Clara MOUSSA to Fadi BOUSTANY*
> ➤ *Exhibit 26: statement made by Océane Skupien dated 13 November 2022*
> ➤ *Exhibit 26 bis: statement made by Sybille SABET dated 14 November 2022*
> ➤ *Exhibit 27: statement made by Dr TOLASANO dated 14 November 2022*

The children have been traumatized by the separation, under particularly brutal conditions.

They now need stability and a great deal of attention which should not be delegated to nannies, the father being physically unable to provide such attention for his children.

At the moment, the children are living, temporarily, in Monaco, with friends of their mother who are themselves away, and who have made their apartment temporarily available to them.

Fadi BOUSTANY, who has always known where his children were living, contrary to the terms of his lawyer's official correspondence, has never raised the slightest objection, thus recognizing that the interest of the children is perfectly maintained.

To demonstrate this, it will be noted that, on 2 November 2022, when Clara MOUSSA returned from New York and the children returned from holidays spent with their father, the latter went to their mother's temporary home, accompanied by their nanny.

They asked to stay with their mother.

Fadi BOSUTANY has always been informed of his children's choice, so much so that he agreed to the nanny making several trips between the father's and mother's homes to retrieve the children's belongings.

> ➤ *Exhibit 28: statement made by Aleksandra WISNIEWSKA dated 12 November 2022*

The following day, Clara MOUSSA wondered whether Fadi BOUSTANY would like to see his children but did not obtain any response.

A lunch was finally arranged on Sunday 6 November following which, naturally and without any objection, the children were returned to their mother.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

During the days that followed, Clara MOUSSA once again asked their father about his intentions with the children and ended up being informed of his refusal to take them for lunch on the Wednesday even though that was what normally happened.

Fadi BOUSTANY only took the children the following Sunday, at 13:00, lunchtime.

In 13 days, Fadi BOUSTANY therefore only asked to share two lunches with his three children and did not spend one night with them.

> ➢   *Exhibit 9 : SMS exchange between Clara and Fadi BOUSTANY commencing on 2 November 2022*

It is therefore regrettable that he has ordered his lawyer to write that he would not have agreed to the children staying with their mother.

Under these conditions, whatever the Court decides as to Clara MOUSSA's accommodation, the children's residence should be fixed with their mother.

## C. On the rights to visit and accommodate the children

Clara MOUSSA agrees to the arrangement of the visiting and accommodation rights proposed by the father, and agrees to his having his children every other weekend from Friday after school to Monday morning, he being responsible for arranging for the children to be picked up from school and returned there.

She also agrees to his arranging short summer holidays.

During the summer holidays, however, she would like the father to have two weeks' holiday, being able to fix the dates two months in advance at the latest.

The father will be able to see his children based on the terms stipulated during term time over the rest of the summer period excluding the period during which the children will be abroad with their mother and without that period exceeding one month.

Nevertheless, taking into account Fadi BOUSTANY's state of health, it will be advisable to order that the children always be accompanied by their regular nanny, Ms Aleksandra WISNIEWSKA, who will remain with them throughout the period stipulated by the visiting and accommodation rights.

In the further alternative, if the Court were to consider it needs to be more fully informed of the children's needs, and the conditions of accommodation at both parents' homes, it should order the institution of a social services inquiry.

## 4. Contribution to the children's education

The children, aged almost 15 and 9 years of age, are educated at FANB.

They have a lavish lifestyle, like their parents, benefiting from hotel services (spa, beauty treatments and room service).

They travel with a private chauffeur or with the hotel cars and chauffeurs.

They also benefit from private tuition, Arabic lessons, singing lessons for ■ and guitar lessons for ■■ and ■■

■ practises dancing to a high level at DCOMPLEX23, the most prestigious school.

The boys are enrolled for various sports, karate, football, etc.

The children also benefit regularly from private swimming lessons at the Beach Club where they have an annual membership and from tennis lessons at the Country Club.

They also have private lessons in mountain skiing and water skiing as well as surfing.

They also have private horseriding lessons in Biarritz during their holidays.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

They regularly attend sailing courses at the Yacht Club of Monaco where their parents are members.

Each year, they have a box at the circus in Monaco.

■ has taken part in summer camps in New York, since the summer of 2022.

Their birthdays are always organized with private entertainers and many guests costing almost €10,000 for the most recent event.

They travel throughout the year and stay in luxury hotels.

Consequently, the children's lifestyle, over the last three years, as Clara MOUSSA has been able to trace, thus amounts to more than €1,300,000.

| SUMMARY OF CHILDREN'S EXPENSES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Clothing | Leisure | Toys / Birthdays | Education | Fixed expenses / Pocket money | Health | TOTAL |
| 2019 | €23,710.56 | €82,910.00 | €12,500.15 | €29,640.00 | €158,660.32 | €16,183.52 | €323,604.55 |
| 2020 | €40,030.83 | €91,979.35 | €12,274.85 | €36,640.00 | €155,452.00 | €16,000.00 | €352,377.03 |
| 2021 | €6,209.13 | €88,316.00 | €10,019.96 | €40,640.00 | €155,452.00 | €18,537.72 | €319,174.81 |
| 2022 | €11,244.33 | €96,151.10 | €7,878.52 | €39,640.00 | €155,452.00 | €16,100.00 | €326,465.95 |
| | | | | | | | |
| | €81,194.85 | €359,356.45 | €42,673.48 | €146,560.00 | €625,016.32 | €66,821.24 | €1,321,622.34 |

This cannot be considered to be an exhaustive budget as it only takes into consideration the expenses that the mother is aware of.

Nevertheless, it represents a monthly sum of more than €30,000.

The family also has:

- A chauffeur constantly available to the children. In actual fact, Fadi BOUSTANY employs three chauffeurs who take turns to be constantly at the family's service;
- A full-time nanny, Alexandra, who is currently paid €3,500 net per month (that is, €5,000 including charges) and a part-time nanny who is currently paid a wage of €1,500 (that is, €2,500 including charges);
- Sundry services (beauty treatments and massages for Léa) for an average monthly sum of €1,000 currently provided by SCI METROPOLE.

The children have free access to all the Le Métropole hotel services, whether catering points, kids club, swimming pool, spa, room service, etc.

The children must also have private health insurance amounting to €16,000 per annum for the three children.

The children must be able to continue to benefit, with their mother, from the same lifestyle as during their life together, maintaining their holidays and other forms of lifestyle.

Clara MOUSSA therefore wishes to hire a nanny and a chauffeur to assist her.

It would be appropriate for the nanny closest to the children, Aleksandra, to be hired by the mother (by taking over her employment contract), which involves the consent of Fadi BOUSTANY, her current employer.

Clara MOUSSA consents and requests that the nanny go with the children when they are with their father to maintain their habits as far as possible.

This point does not change the financial measures in any way, the employees generating a monthly cost of at least €8,000.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

Consequently, Clara BOUSTANY is well-founded in requesting the sum of €60,000 as a contribution to the education of the three children, that is, €20,000 per child.

Fadi BOUSTANY will also bear the costs of their schooling (enrolment, private lessons, uniforms, dining hall, etc.), sports subscriptions and necessary clothing, and health expenses (including health insurance, healthcare plan and medical expenses payable).

### §3. On the financial measures

Article 202-1 of the Civil Code provides that interim measures may relate to requests for maintenance, which are based on the responsibility for maintenance and assistance that spouses owe each other until the divorce is pronounced.

This allowance must allow an equivalent quality of life to be maintained within the limit of the means of the other spouse. These claims must be based on the income and wealth of the spouses but also on the expenses arising from their life together.

### A. Maintenance

### 1. Clara MOUSSA's financial and capital position

In April 2006, Clara MOUSSA left her county of origin to move to Monaco. She then stopped working for the company MYTCO, set up by her father, in which she remained a shareholder.

She does not receive dividends or income, the latter being reinvested, owing to the situation in Lebanon since 2010.

> ➢   *Exhibit 29: statement made by the accountant dated 11 November 2022*

Since her arrival in Monaco, she has no longer had any paid employment.

She has nevertheless actively supported and assisted her husband in his business.

In 2015, together with Camille BIANCHERI, thanks to the financial support from her husband, which amounted to €250,000, she set up SARL MONACOPOPS in which she was a minority partner as she only holds 10% of the shares.

She has never received dividends.

The company was wound up amicably on 31 July 2017.

> ➢   *Exhibit 30: extract from the Monaco journal concerning the formation of SARL MONACOPOS*
> ➢   *Exhibit 31: extract from the register of trade on SARL MONACOPOPS and extract from the Monaco journal*

Clara MOUSSA has therefore never, during her marriage, had any personal resources or income.

She has no assets of her own or any personal savings.

> •   *Exhibit 32: bank statement dated 14 November 2022*

### 2. Fadi BOUSTANY's financial and capital position

It is publicly known that the BOUSTANY family owns an exceptional property portfolio in Monaco and is one of the 15 wealthiest families in the Principality.

That vast fortune was largely made by Fadi BOUSTANY's parents who set up the Métropole in Monaco.

Fadi BOUSTANY is the heir, together with his brother, Majid, and his sister, Dania, to their father Nabil BOUSTANY, who died in 2009.

He has taken over the majority of his father's activities, with his brother, particularly the Métropole (consisting of the luxury hotel, the residence with luxury apartments, a car park with over 130 spaces, a single space selling for €500,000, and a shopping centre with many boutiques alongside the place du Casino in Monaco), which has largely flourished under his management.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

According to the information Clara BOUSTANY has available, her husband holds a 75% share directly or indirectly in the Métropole complex, the remaining 25% belonging to his brother Majid BOUSTANY.

His fortune amounts to several billion euros.

The Métropole property alone, excluding the Métropole residence, is currently valued at 2.95 billion, while it was valued at 2 billion in 2015.

> ➢ *Exhibit 33: Monte Carlo Real Estate agency file*
> ➢ *Exhibit 34: screenshots demonstrating Hôtel Métropole is on sale for €2.95 billion*
> ➢ *Exhibit 35: extract from the website hotelsmag.com concerning Fadi BOUSTANY*
> ➢ *Exhibit 36: email from Monica SOAVE dated 19 May 2015*

To Clara MOUSSA's knowledge, Fadi BOUSTANY's wealth and his economic interests are scattered throughout the world and are estimated at several billion euros. It will be up to Fadi BOUSTANY to inform his spouse of all the details of his wealth within the scope of the proceedings that he has brought.

It will become apparent, nevertheless, through several searches regarding him as a shareholder and/or manager of several Monacan real estate companies including:

- HECTOR OTTO
- LES JARDINS HECTOR OTTO
- DES REVOIRES
- DES SPELUGUES
- METROPOLE

These companies own several properties in Monaco which are not, however, representative of the actual wealth of the BOUSTANY family, organized through trusts and shell companies in offshore jurisdictions.

> ➢ *Exhibit 37: unofficial certificate dated 10 August 2022 regarding SCI SAINT ROMAN 2010*
> ➢ *Exhibit 38: unofficial certificate dated 11 August 2022 regarding SCI METROPOLE*
> ➢ *Exhibit 39: unofficial certificate dated 11 August 2022 regarding SCI LES JARDINS HECTOR OTTO*
> ➢ *Exhibit 40: unofficial certificate dated 23 August 2022 regarding SCI LES SPELUGUES*
> ➢ *Exhibit 41: lease file on the "Le sardanapale" apartment*

Mr Fadi BOUSTANY is also a director and holds interests in:

- SAM METROPOLE GROUP – valued in September 2012, according to J.P. MORGAN, at €32,779,642.

> ➢ *Exhibit 42: extract from the register of trade regarding SAM METROPOLE GROUP*
> ➢ *Exhibit 43: estimate made by J.P MORGAN of the company SAM METROPOLE GROUP*

- SAM METROPOLE REAL ESTATE – chairman and managing director
  SAM METROPOLE ADMINISTRATION - chairman and managing director

- SAM HOTEL METROPOLE - chairman and managing director

> ➢ *Exhibit 44: extract from the register of trade regarding SAM METROPOLE REAL ESTATE*
> ➢ *Exhibit 45: extract from the register of trade regarding SAM METROPOLE ADMINISTRATION*
> ➢ *Exhibit 46: extract from the register of trade regarding SAM HOTEL METROPOLE*

Fadi BOUSTANY has organized his wealth in a totally opaque fashion, the assets owned being acquired and resold to different opaque corporate structures of which he nevertheless remains the beneficial owner.

He is also at the origin of the Boustany Foundation established between Monaco and Switzerland.

The aforesaid foundation makes particularly substantial donations and finances over 120 large-scale programmes.

> ○ *Exhibit 47: extracts from the website of the foundation owned by Mr Fadi BOUSTANY*

He also has substantial property assets in Lebanon.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

He also has substantial movable property, and in particular:

- o Vehicles valued at around €370,000 (one BMW model X5, one BMW series 7, two Mercedes model VIANO, one Audi A3, one Mercedes class E).

➢ *Exhibit 48: registration certificates*

- o Works of art on display in the marital home worth almost €450,000, particularly a tapestry by Robert Indiana (Love) estimated at €12,000, a painting by Julien Opie (Verity walking) worth €11,500, and Luc and Ludivine worth €5,100, a tapestry by Andy Warhol worth €18,000, an antique fireplace estimated at €4,850, a work on canvas by Shi Lifeng worth €55,000, a work on canvas by Victor Vasarely worth €73,770 and furniture by Coulombs amounting to €255,000.

***

Bearing in mind the complexity of the arrangements made and the international nature of the corporate structures, Clara MOUSSA is unable to estimate the extent of her husband's wealth, which she nevertheless knows to be huge.

This wealth has, in any event, enabled him to provide an exceptional lifestyle for the entire family for almost 20 years.

## 3. **The couple's lifestyle**

Article 181 of the Civil Code requires spouses to observe responsibility for maintenance which takes the form of a maintenance allowance during the divorce proceedings, as provided for by article 202-1, paragraphs 3 and 4.

It is established case law that the responsibility for maintenance, during divorce proceedings, aims to maintain the standard of living the couple experienced during their life together. It has thus been judged that:

"*the assessment of the claim for maintenance provided for by article 202-1 of the Civil Code must take into account the recipient's needs and the payor's ability to contribute*". (Review Court, 31 May 2013, Ms v BO wife of CU. v. Mr s.CU)

The Court of Appeal of Monaco has pointed out that:

"*the maintenance awarded to the spouse based on the responsibility for maintenance must ensure that the latter has **the same standard of living that he was entitled to claim during their life together** bearing in mind the ability of the other spouse and his own ability*". (Court of Appeal, 8 January 2013 database identifier 10073)

It has since confirmed that:

"*pursuant to the provisions of article 202-2 of the Civil Code, the calculation of maintenance shall take into account the needs of the person receiving the maintenance and the payor's ability to contribute, such needs arising from the necessities of everyday life and valued by taking into account, to a certain extent, the couple's lifestyle during their life together;*

*Whereas such an assessment, intended to maintain an everyday life approximately equivalent to the couple's life during their marriage during the course of the divorce proceedings*" (Court of Appeal of 10 November 2015 database identifier 14227)

It thus considered that:

"*Ms PI. is now in a situation of need, following the end of the very high lifestyle to which she was previously accustomed;*

*Whereas, in the light of this evidence, the needs of Ms PI.'s everyday life, Mr PI's ability to contribute and their lifestyle during their life together, Ms PI's claim should be accepted.*" (Court of Appeal of 19 December 2017 Ms r.SC wife of PI. v. Mr PI.)

*The neighbouring country also judged that:*

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

"*Whereas, however, after noting the resources and the expenses of each of the spouses, the judgment considers that Ms A's income was not sufficient to provide her with the quality of life that she was able to claim, bearing in mind her husband's ability*" (French Court of Cassation, 2nd Civil Division, 7 May 1980, no. 78-15.739, Bull. II no. 97)

The responsibility for maintenance must thus be envisaged from the angle of need on the basis of the couple's quality of life during their marriage, and life together more broadly.

*** 

In this particular case, the couple had initially set up home in a five-room apartment, situated in the Patio Palace, made available to them by SCI LES JARDINS HECTOR OTTO which, as shown, had connections with Fadi BOUSTANY.

In 2010, the couple moved to an extremely luxurious 8-room apartment, of over a 410 m2, situated on the 9th floor in the METROPOLE Residence, 1 avenue des Citronniers, all running expenses being paid and made available to it free of charge by SCI DU METROPOLE.

- *Exhibit 49: Photographs of the marital home*

The family also benefits from the services provided by the Hôtel du METROPOLE (hotel services, caretaker, meals prepared by the chefs supplied twice a day, valet parking, dry cleaning as well as a spa, gym, massages, beauty salon and 24-hour room service), which are paid for by SCI METROPOLE.

Although it is difficult to put a value on such a comfortable lifestyle in a luxury hotel residence and to estimate the services from which the family has been able to benefit, they could be considered to amount to not less than €30,000 per month, broken down as follows:

| | |
|---|---|
| Transport with valet parking | 5,000 |
| Room service | 22,000 |
| Well-being | 3,000 |

Fadi BOUSTANY also covers the costs of the accommodation, telephone, internet, etc., as well as medical expenses and private insurance, through his various companies or personally.

The family's everyday life has also been improved by the presence of two nannies, one who lives in the home and the second who works part-time, three chauffeurs and two housekeepers, as well as Fadi BOUSTANY's private staff and all the METROPOLE staff at their disposal.

The family has therefore never had to carry out the slightest household task in 12 years of living together.

Beyond the particularly comfortable everyday life from which the family has been able to benefit, Fadi BOUSTANY has always been generous with his wife, offering her gifts of great value and in particular allowing her to make a collection of Hermès bags which she has vowed to pass on to her daughter ███.

Fadi BOUSTANY has also enabled his family to make dream trips, during every school holiday period, benefiting from private flights and having access to unique experiences (such as private boxes in theatres, private hire of places to visit, etc.).

The family has also travelled across USA, visited Dubai, travelled throughout Europe and organized ski trips in luxury hotels in the legendary ski stations.

By way of example, during their last holidays together, the family hired a luxury residence in Saint Tropez for an amount of €80,000 per week and requested the services of a chef and domestic staff.

The family's holiday expenses have always been borne by Fadi BOUSTANY, so that the pleading party is unable to provide evidence of the entire holiday budget, which she has nevertheless established at a minimum amount of €300,000.00.

This amount must be doubly weighted.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

Firstly, Clara MOUSSA has been unable to trace all the expenses but only those for which bills had been drawn up (excluding the restaurants and expenses paid directly by Fadi BOUSTANY).

Moreover, over the reference period (2018 – June 2022), the travel budget – just as all the expenses – was affected by the health crisis for almost two years.

The average annual budget, as demonstrated, for the holidays amounted to around €400,000.

One may more reasonably consider that the holiday budget amounts to around €400,000 per annum.

In addition to this comfortable lifestyle, Clara MOUSSA has always been able to spend freely, up till the end of 2018.

In fact, she used her husband's AMEX Centurion in particular for her personal expenses and those of the children.

Not having access to the statements of account, she is unable to provide evidence of her expenses which she estimates at at least €30,000 per month.

In addition, her husband also made regular transfers to her personal account opened at LCL in which he alone deposited money, covering his wife's exceptional expenses, if necessary.

As from 2019, clearly already driven by the desire to separate from his wife, Fadi BOUSTANY gradually but noticeably changed the family habits.

He suddenly starting making regular transfers to the pleading party's bank account limited to €9,000 every month and €13,000 per quarter, entitled "maintenance", which replaced the random transfers made based on the family's needs.

He subsequently reduced access to the AMEX card before purely and simply withdrawing it from her, without any explanation.

These changes sadly took place at the same time as the deterioration in his state of health and the unfounded complaints made against his wife, thus giving her the feeling of financial sanctions.

Despite the restrictions imposed by her husband and the deliberate reduction in her lifestyle, Clara's expenses for her own personal needs (by way of pocket money) over the reference period amount to an overall sum of €1,800,000, that is, €30,000 per month.

- *Exhibit 50: Summary of Clara MOUSSA's items of expenditure*
- *Exhibit 51: Clara MOUSSA's personal account statements*

The family's overall annual budget, underline excluding Fadi BOUSTANY's personal expenses and those of the children specifically which will be dealt with in the section concerning them, thus amount to sum of €3,120,000, **that is, €260,000 per month**, broken down as follows:

| Year | Total | Clothing | Jewellery | Bags | Leisure / subscriptions / contributions | Staff expenses | Fixed expenses | Food | Travel | Health | Vehicle maintenance | Sundry | Cosmetics | Dog expenses |
|------|-------|----------|-----------|------|------|------|------|------|------|------|------|------|------|------|
| *2018* | €2,879,301.67 | €106,039.96 | -€ | €34,486.35 | €70,501.77 | €317,540.00 | €1,825,710.97 | €15,284.36 | €374,422.66 | -€ | -€ | €130,233.77 | €5,081.83 | |
| *2019* | €2,772,864.76 | €116,344.57 | -€ | €19,776.90 | €64,508.35 | €318,097.50 | €1,824,295.68 | €22,312.97 | €295,783.38 | -€ | -€ | €99,910.37 | €11,835.04 | €1,584.30 |
| *2020* | €2,755,592.34 | €82,504.37 | -€ | €44,799.00 | €71,034.06 | €322,320.80 | €1,821,286.55 | €39,938.30 | €264,916.47 | -€ | -€ | €99,547.92 | €9,244.87 | €1,859.90 |
| *2021* | €2,580,079.02 | €101,224.20 | -€ | €22,510.00 | €60,481.61 | €316,240.00 | €1,813,673.76 | €42,152.05 | €135,316.25 | -€ | -€ | €78,380.22 | €10,100.93 | €146.80 |
| *2022* | €2,561,072.46 | €36,780.48 | -€ | €21,675.00 | €63,332.74 | €322,380.00 | €1,821,393.84 | €29,395.74 | €213,667.89 | -€ | -€ | €49,804.32 | €2,642.45 | €66.00 |
| *TOTAL* | €14,371,925.09 | €442,893.58 | €666,940.00 | €143,247.25 | €329,858.53 | €1,596,578.30 | €9,106,360.80 | €149,083.42 | €1,284,106.65 | €154,002.14 | -€ | €457,876.60 | €38,905.12 | €2,072.70 |

For the future, Clara BOUSTANY's specific expenses may be estimated at a monthly sum of €205,600 broken down as follows:

- €80,000 by way of rent for accommodation and related expenses;
- €12,000 by way of fixed expenses (food, insurance, electricity, water, standing charges, telephone, etc.);
- €30,000 by way of personal expenses (clothing, leisure, beauty treatments, etc.);
- €33,000 for travel (annual budget *pro rata*)

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

    –   €30,000 for services offered by the hotel (well-being, valet parking, dry cleaning service);
    –   €15,000 for domestic staff expenses (housekeeper, cook, chauffeur);
    –   €1,600 for private health insurance (€20,000 p.a.);
    –   €2,500 for the leasing of a luxury vehicle (as made available to her up till then) and maintenance thereof.

The maintenance to be borne by Fadi BOUSTANY will be fixed at the sum of €205,000.

### §4. Ancillary measures

**1. Financial expertise**

Although it has been demonstrated that Fadi BOUSTANY is very wealthy, it is impossible for Clara MOUSSA to make an exact evaluation of the true extent thereof, as, to her knowledge, it consists of:

- shares in foreign companies;
- trusts;
- properties situated in Monaco and Lebanon in particular, which have not been valued recently and which were acquired by legal persons;
- income from commercial and civil leases drawn up by the various real estate companies;
- assets and shares held in various accounts abroad.

As Clara MOUSSA gave up her own career to devote herself to her family life and has not worked at all since then, she may validly claim the allocation of compensation.

Although the principle of compensation appears to be established and indisputable, it will only be possible to establish the amount once her husband's wealth has been established.

Clara MOUSSA is in this respect entitled to request the appointment of a judicial expert to determine the resources and wealth of each of the parties since their marriage.

The judge responsible for assessing the expert appraisals will be appointed and will have to take all useful measures to force Fadi BOUSTANY to cooperate.

**2. The provision for litigation costs**

Fadi BOUSTANY arranged his separation many months ago, regardless of the children's emotional and social environment, and has not hesitated to call upon everyone in their circle to ask them to testify against their mother.

He has deliberately taken all measures to harm his wife who, however, has always supported him, and has stayed by his side for 16 years.

He first tried to "*negotiate*" to repudiate her and to make her disappear from his life, by depriving her of all financial and non-financial rights and refusing her the most basic transparency, leading her to try and obtain information.

He deliberately transferred assets to the United States, set up trusts, and instructed a lawyer in Geneva, who initially indicated that he was taking charge of the divorce.

Far from looking for peaceful solutions with her, he increased his unnecessarily aggressive and brutal attitudes, even refusing to talk to her until her departure for the United States, hastening to obtain her eviction from the time she left.

In this particularly distressing context, Clara MOUSSA fears that her husband is driven by a desire for condemnation and is increasing his manoeuvres and procedures both to harm her but also to try and suffocate her financially.

The fact that Clara MOUSSA has no income of her own and her husband's wealth must not enable him to use unequal arms in a war that he himself has initiated.

Clara MOUSSA has thus had to organize her defence as a matter of urgency and will have to incur substantial expenses to assert her rights.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

It should also be pointed out that the couple are English-speaking, so that substantial translation costs should be provided for, which already stand at more than €30,000 and may reach €100,000 following the proceedings.

Similarly, because Fadi BOUSTANY has kept his wealth unclear to a certain extent, a financial assessment will have to be ordered.

The expert's measures will cover the arrangements set up by Fadi BOUSTANY and will be made far more complex by the international not to mention the global nature of the organization of his assets.

The costs will be paid in advance by Clara MOUSSA and may also amount to €100,000.

In order to enable her to defend herself appropriately, she has good reason to request a provision for litigation costs in the sum of €600,000, it being stipulated that she has already incurred substantial costs.

### ON THESE GROUNDS

- **<u>Firstly,</u>**

**Note** the lack of any legal basis or grounds of the claim for extremely interim measures.

Consequently,

**Dismiss** Fadi BOUSTANY's claim for extremely interim measures,

- **<u>On the interim measures</u>**

**<u>On the couple's accommodation</u>**

**Order** Fadi BOUSTANY to pay a sum of €650,000.00 to enable Ms MOUSSA to arrange a lease agreement immediately,

**<u>On the measures concerning the children</u>**

**Declare** that parental authority shall be exercised jointly in respect of the minor children,

**Fix** the children's residence at the home of Ms MOUSSA,

**Grant** Fadi BOUSTANY a visiting and accommodation right, which must be exercised in the presence of the children's nanny, Ms Aleksandra WISNIEWSKA, unless agreed otherwise by the parties:

- <u>During term time</u>:

  − Every other weekend from Friday evening after school to Monday morning on returning to school, the father being responsible for arranging for the children to be picked up from school and returned there on Monday morning.
  − Every Wednesday afternoon, after school until 18:00, the father being responsible for arranging for the children to be picked up from school and returned to their home at 18:00, and to arrange for them to be taken to and collected from their activities.
  − On Father's Day.

- <u>During the school holiday period</u>:

  − Half the short school holidays, alternating each year: the first half in the even years and the second half in the odd years for the children to spend Christmas with their parents in alternate years.
  − For two weeks during the summer holidays, the father being responsible for informing the mother by any means at least two months in advance, maintaining his regular visiting and accommodation rights when the mother is not abroad with the children.

Summons served on 31 October 2022
MOUSSA/BOUSTANY
Conciliation hearing of 16 November 2022

**Order** Fadi BOUSTANY to pay a contribution to the children's maintenance in the sum of €20,000 per child per month,

**Declare** that the contribution to maintenance and to education will be indexed on 1 January each year and for the first time on 1 January 2023 to the INSEE consumer price index for all household goods excluding tobacco in the whole of France according to the following formula:

New contribution = initial contribution x new index

Base index

**Declare** that Fadi BOUSTANY will also bear the schooling and extra-curricular costs of the children,

**Declare** that Fadi BOUSTANY will continue to cover the healthcare plans and medical expenses for the three children,

**On the measures concerning the couple**

**Order** Fadi BOUSTANY to pay Clara MOUSSA a sum of €650,000 in respect of his responsibility for maintenance so that she can find new accommodation immediately

Also **order** Fadi BOUSTANY to pay Clara MOUSSA a monthly maintenance allowance of €205,000 fulfilling his responsibility for maintenance,

**On the ancillary measures**

**Appoint** the appropriate accountant with the task of determining the extent of Mr Fadi BOUSTANY's wealth in 2018 and after that date, with the fullest powers of investigation and in particular allowing him to make such evaluation despite the existence of shell companies, the offshoring of assets or even the placement thereof within trusts, and to check and estimate the family's actual expenses and their lifestyle during their life together, and appoint any expert of its choice in Monaco but also in Switzerland, USA, Lebanon and Luxembourg in particular, at the expense paid in advance by Fadi BOUSTANY,

**Order** the return to Clara MOUSSA of all her personal effects, particularly her clothes, equipment, films and souvenirs,

**Order** Fadi BOUSTANY to pay Clara MOUSSA a provision for litigation costs of €600,000.00,

**Dismiss** Fadi BOUSTANY's claims, aims and submissions,

**Reserve** costs.

**SUBJECT TO ALL RESERVATIONS**

**For the pleading party**

Monaco, 15 November 2022



Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

> **CONCLUSIONS**
> **SUR MESURES PROVISOIRES**

POUR:

**Madame Clara MOUSSA épouse BOUSTANY, ci-après désignée Clara MOUSSA**

Comparaissant et plaidant par Maître Sarah FILIPPI

CONTRE:

**Monsieur Fadi BOUSTANY**

Comparaissant et plaidant par Maître Christine PASQUIER-CIULLA

1

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

**PLAISE AU MAGISTRAT CONCILIATEUR**

### I.      Faits et procédure

En avril 2005, Dania BOUSTANY va présenter à Clara MOUSSA née le ██████ 1974 à Deir El Kamar (Liban), de nationalité franco-libanaise, son frère, Fadi BOUSTANY, né le ██████ 1967 à Debbieh au Liban, de nationalité libano-suisse lequel vit alors à Monaco.

Clara MOUSSA est alors ressortissante libanaise, jeune diplômée d'études d'économie et titulaire d'un MBA.

A cette période, elle travaille dans l'entreprise de son père comme administratrice.

Le couple se rencontre souvent lors des séjours de Clara MOUOSSA dans le Sud de la France, où ses parents résident et à l'occasion de vacances.

Durant un week-end à Paris, en juin 2005, Fadi BOUSTANY a demandé Clara MOUSSA en mariage, ce qu'elle a accepté.

Il reviendra presque immédiatement sur sa demande indiquant avoir besoin d'un délai de réflexion.

En septembre 2005, ce dernier retourne au Liban et demande à revoir Clara MOUSSA dans une église. Il lui annonce être atteint d'une sclérose en plaques, le diagnostic ayant été, selon ses confidences, posé durant l'été. Il lui demande néanmoins de l'épouser.

Malgré le choc de l'annonce et de ses conséquences pour le futur, Clara MOUSSA acceptera sa demande et quittera son pays d'origine pour s'installer à Monaco auprès de Fadi BOUSTANY en avril 2006, dans un appartement situé au Patio Palace.

Leur mariage est célébré par-devant l'officier public de Monaco, le 11 novembre 2006, sous le régime légal de séparation de biens, en l'absence de contrat préalable à leur union, dans la plus stricte intimité (11 invités), à la demande de l'époux.

Trois enfants sont, grâce à un protocole médical et notamment après plusieurs tentatives éprouvantes de FIV, issus de cette union :

- ❖ ████, née le ████ 2007 à Nice, France, de nationalités libanaise et suisse
- ❖ ████, né le ████ 2013 à Nice, France, de nationalités libanaise et suisse
- ❖ ████, né le ████ 2013 à Nice, France, de nationalités libanaise et suisse

A partir de septembre 2010, le couple s'est installé dans un appartement de la Résidence du Métropole gracieusement mis à sa disposition par la SCI DU METROPOLE.

En 2013, pour la naissance des jumeaux des travaux ont été réalisés pour réunir un duplex au logement initial.

La famille y réside depuis lors.

La vie du foyer a toujours été rythmée par la maladie de Fadi BOUSTANY, la famille ayant affronté et subi ensemble la dégradation de son état de santé.

Depuis 2018-2019, Clara MOUSSA a constaté, impuissante, un changement de comportement de son époux, lequel s'est montré plus agressif, ayant des humeurs changeantes, des propos parfois incohérents, lui faisant des reproches infondés qu'elle a alors imputé à sa maladie.

A cette même période, compte tenu de la perte d'autonomie de Fadi BOUSTANY, sa sœur (avec laquelle il était en conflit depuis le décès du père courant 2009) et sa mère ont été omniprésentes dans son quotidien.

Clara MOUSSA a néanmoins tout mis en œuvre pour continuer à soutenir son époux et maintenir avec lui des activités familiales et des voyages, malgré l'évolution rapide de sa maladie, l'ayant paralysé à hauteur de 98%.

C'est dans ce contexte douloureux qu'en date du 28 avril 2022, le Conseil suisse de Fadi BOUSTANY a adressé un courrier à Clara MOUSSA lui faisant part de son souhait de divorcer, privilégiant alors la voie amiable.

> ➢   *Pièce n°1 : courrier de Maître BONNANT à Clara MOUSSA du 28 avril 2022*

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

Etonnée de la teneur de ce courrier, Clara MOUSSA n'a pas manqué d'interroger son époux, qui l'a immédiatement rassurée l'invitant à ne pas en tenir compte.

Cette dernière a dès lors adressé un courrier en ce sens au conseil de son époux, lequel s'est empressé de contester les propos tenus par Fadi BOUSTANY et de confirmer son intention de divorcer, la priant de prendre l'attache d'un conseil en vue d'un « *rendez-vous* ».

> ➢ *Pièce n°2 : courrier de Clara BOUSTANY à Maître BONNANT du 16 mai 2022*
> ➢ *Pièce n°3 : courrier de Maitre BONNANT à Clara BOUSTANY du 3 juin 2022*

Clara BOUSTANY s'est exécutée.

Dans le même temps, elle a néanmoins constaté que son époux refusait presque toute communication avec elle, se contentant de lui adresser des messages électroniques, mais également toute activité en famille.

Progressivement, Fadi BOUSTANY a ainsi imposé une répartition des droits avec les enfants, alors même que ceux-ci étaient dans la plus totale incompréhension de la situation et voyaient leur mère évincée brusquement de leur vie de famille.

Durant les vacances de la Toussaint, il a consenti à ce que les enfants se rendent à New York avec leur mère durant la première période, pour le rejoindre ensuite, pour la seconde période, un voyage dans le Sud de la France étant prévu à compter du samedi 29 octobre 2022.

A quelques heures du départ de Clara MOUSSA, avec ses enfants, et alors que l'époux refusait tout échange direct depuis de nombreuses semaines, il l'a convoquée pour lui indiquer qu'il déposerait, durant son absence, une requête en divorce, considérant que les discussions amiables n'avaient pas pu aboutir.

Selon <u>requête en date du 26 octobre 2022</u>, Fadi BOUSTANY a sollicité l'autorisation de faire citer son épouse à une audience de conciliation et dans l'intervalle de résider seul au domicile conjugal, exposant que son épouse aurait adopté un « **comportement délétère et particulièrement choquant** », proposant néanmoins de la reloger dans un appartement de 5 pièces situés dans la résidence le « *Florestan* ».

Selon Ordonnance présidentielle du même jour, il y a été autorisé, défense étant faite à Clara BOUSTANY de le troubler.

A cette même date, et conformément à ce qui était convenu entre les Parties, les enfants ont quitté New York pour rejoindre leur père.

Clara MOUSSA est restée à New York, devant assister à un gala de bienfaisance en date du 3 novembre.

Clara MOUSSA n'avait alors aucune connaissance de l'Ordonnance présidentielle.

Par l'intermédiaire de son Conseil, elle en sollicitait copie dès le 27 octobre 2022, rappelant qu'elle était absente de la Principauté.

> ➢ *Pièce n°4 : courrier du Conseil de Clara MOUSSA à celui de Fadi BOUSTANY du 27 octobre 2022*

Le vendredi 28 octobre 2022 dans la soirée, Fadi BOUSTANY a fait procéder au changement des serrures du domicile conjugal, sous le regard de ses enfants, provoquant leur panique. Ces derniers en ont immédiatement référé à leur mère.

L'opération a eu lieu quelques heures avant que le père et les enfants ne partent en vacances et alors que les intervenants savaient parfaitement que Clara BOUSTANY se trouvait à des milliers de kilomètres.

Une telle intervention aurait pu et dû être organisée, hors la présence des enfants, ce d'autant que, dans l'attente, la sécurité du Métropole aurait pu interdire l'accès de la résidence à Clara BOUSTANY.

> ➢ *Pièce n°5 : photographie du serrurier en intervention au domicile conjugal*

Le 31 octobre 2022, Fadi BOUSTANY a régulièrement fait citer son épouse à l'audience de conciliation fixée au 16 novembre 2022.

Clara MOUSSA s'organisait pour anticiper son retour à Monaco.

Elle indiquait, par l'intermédiaire de son Conseil, qu'elle entendait voir ses enfants dès son arrivée et qu'elle serait, dans l'attente de trouver un nouveau logement, accueillie avec ses enfants chez une amie.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

➢ *Pièce n° 6 : mail du conseil de Clara MOUSSA à celui de Fadi BOUSTANY du 1er novembre 2022*

Selon courrier officiel du 2 novembre 2022, le conseil de Fadi BOUSTANY a fait savoir que « *le bail en discussion au Florestan n'a pas pu se concrétiser* », contrairement à ce qui avait été annoncé à l'audience du 26 octobre 2022, mais a proposé de loger jusqu'à l'audience de conciliation son épouse (sans les enfants ?) à l'hôtel Méridien, avant qu'elle ne puisse intégrer un appartement mis à sa disposition au Patio Palace.

Fadi BOUSTANY prenait le soin de faire préciser que les enfants pouvaient ponctuellement voir leur mère à la condition que celle-ci s'engage à ne « *pas dramatiser la situation* ».

Fadi BOUSTANY précisait par ailleurs qu'une résidence alternée pouvait ensuite être envisagée.

➢ *Pièce n°7 : courrier en réponse du conseil de Fadi BOUSTANY à celui de Clara MOUSSA du 2 novembre 2022*

Réponse a été adressée au conseil de Fadi BOUSTANY, lui précisant que Clara MOUSSA s'installerait provisoirement chez une amie pouvant y accueillir ses enfants.

➢ *Pièce n°8 : courriel du conseil de Clara MOUSSA à celui de Fadi BOUSTANY du 2 novembre 2022*

Dans les faits, les enfants ont spontanément souhaité rester auprès de leur mère, dans un appartement qu'ils connaissaient déjà, l'hôte étant une amie proche de Clara MOUSSA, laquelle était absente de la Principauté.

Le père ne s'y est aucunement opposé.

➢ *Pièce n°9 : SMS échangés entre Clara et Fadi BOUSTANY à compter du 2 novembre 2022*

Le 3 novembre 2022, Fadi BOUSTANY faisait notamment écrire par son Conseil qu'il convenait « *de [lui] proposer des droits de visite en attendant la conciliation* ».

Il rappelait sa volonté de reloger Clara MOUSSA et les enfants dans la résidence du Patio Palace et son souhait que les enfants restent au domicile paternel et qu'il ne leur soit pas fait obligation de vivre chez des étrangers.

➢ *Pièce n°10 : courrier du conseil de Fadi BOUSTANY à celui de Clara MOUSSA du 3 novembre 2022*

Clara MOUSSA, afin de ne pas instrumentaliser la justice en multipliant les courriers officiels, a préféré maintenir autant que possible une communication directe avec le père des enfants.

Les Parties sont ainsi parvenues à s'entendre sur la répartition de leurs droits, les enfants ayant choisi de rester auprès de leur mère.

➢ *Pièce n°9 : échange SMS entre Fadi BOUSTANY et Clara MOUSSA à compter du 2 novembre 2022*

Le 11 novembre 2022, Clara MOUSSA faisait adresser un courriel au Conseil de son époux lui indiquant qu'il ne saurait être question pour lui d'imposer d'une quelconque manière à la concluante son nouveau lieu de vie.

Elle a ainsi effectué des visites en vue d'assurer son relogement avec les trois enfants, lequel impliquant un budget de 650.000 euros (loyers, garanties, caution, ameublement et frais courants).

➢ *Pièce n°11 : courrier du conseil de Clara MOUSSA à celui de Fadi BOUSTANY du 11 novembre 2022*

Concomitamment à l'envoi de ce courrier, le conseil de Fadi BOUSTANY indiquait qu'il ne pourrait pas être en état pour l'audience de conciliation du 16 novembre et qu'il serait amené à solliciter un renvoi.

Dans cette attente, il attendait néanmoins qu'il soit tranché sur le relogement de l'épouse et les droits relatifs aux enfants.

➢ Pièce n°12 : courrier du conseil de Fadi BOUSTANY à celui de Clara MOUSSA du 11 novembre 2022

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

A l'appui de sa missive, Fadi BOUSTANY faisait déposer des écritures sur mesures extrêmement provisoires sollicitant :

❖ En cas d'acceptation de l'offre de relogement au Patio Palace par Clara MOUSSA de prendre acte de la proposition de Fadi BOUSTANY de mettre en place une résidence alternée et à défaut de fixer la résidence des enfants au domicile maternel avec des droits de visite et d'hébergement en faveur du père à raison d'une fin de semaine sur deux du vendredi au lundi et le mercredi de la sortie des classes jusqu'à 18 heures ainsi que pour la fête des pères et la moitié des vacances scolaires par alternance chaque année.

❖ En cas de refus de l'offre de relogement, la fixation de la résidence des enfants au domicile paternel avec droits de visite en faveur de la mère à raison d'une fin de semaine sur deux du vendredi au lundi et le mercredi de la sortie des classes jusqu'à 18 heures ainsi que pour la fête des mères et la moitié des vacances scolaires par alternance chaque année.

A réception de ce courrier, Clara MOUSSA faisait rappeler d'une part l'urgence qu'il soit statué sur l'ensemble des mesures provisoires et d'autre part qu'un accord avait été trouvé concernant les enfants.

➢ *Pièce n°13 : courrier du conseil de Clara MOUSSA à celui de Fadi BOUSTANY du 12 novembre 2022*

En réponse, Fadi BOUSTANY soutenait, par l'intermédiaire de son conseil, qu'aucun accord n'avait été trouvé mais qu'au contraire Clara MOUSSA avait décidé arbitrairement de garder les enfants auprès d'elle.

➢ *Pièce 14 : courrier du conseil de Fadi BOUSTANY à celui de Clara MOUSSA du 12 novembre 2022*

Clara MOUSSA s'inscrivait en faux.

➢ *Pièce n°15 : courrier du conseil de Clara MOUSSA à celui de Fadi BOUSTANY du 14 novembre 2022 concernant le relogement et les enfants*

Pour autant, ne reculant devant rien, Fadi BOUSTANY n'a pas hésité, afin de contraindre son épouse à se plier à ses exigences quant à son logement, de tenter de lui faire remettre les clés de l'appartement qu'il lui a assigné, dès le 14 novembre 2022, soit deux jours seulement avant l'audience de conciliation, par un huissier de justice s'étant présenté à l'Etude de l'avocat défenseur soussigné.

➢ *Pièce n°16 : courrier du conseil de Clara MOUSSA à celui de Fadi BOUSTANY du 14 novembre 2022 concernant la remise des clés du Patio Palace*

D'ailleurs, dès le 11 novembre 2022, Monsieur Fadi BOUSTANY a fait déposer des conclusions contenant des demandes de mesures extrêmement urgentes s'agissant d'une part, du logement de la concluante, et d'autre part de mesures concernant les enfants.

## II.     Sur les demandes de mesures extrêmement urgentes

Force est de constater que si les dispositions de l'article 202-1 du Code civil prévoient qu'il appartient au Juge conciliateur de statuer sur les demandes de mesures provisoires des époux, devant régler leurs rapports pendant l'instance en divorce, aucune disposition légale, ni procédurale ne prévoit la faculté pour le Juge de prendre des mesures « *extrêmement provisoires* ».

Les mesures extrêmement provisoires sollicitées par l'époux n'ont, en réalité, vocation qu'à éviter, à ce stade, tout débat sur la situation financière des époux et l'analyse des pièces y afférentes.

Ce procédé n'est pas acceptable au vu de la situation des époux, et des conditions de vie de la famille.

Il est constant que l'urgence en l'espèce est caractérisée pour l'ensemble des demandes de Clara MOUSSA, laquelle, du fait des agissements procéduraux de son époux, se trouve sans logement, ni argent, avec ses trois enfants à charge, alors que Fadi BOUSTANY, qui dispose de moyens financiers absolument extraordinaires, dans le même temps, se maintient seul dans un appartement de 410m² duquel il a évincé sa famille.

Le Juge conciliateur ne saurait, en l'état, statuer sur le logement de Clara MOUSSA sans statuer, de façon, tout aussi urgente, sur les obligations alimentaires et financières de Monsieur Fadi BOUSTANY à l'égard de sa famille.

Telle est l'urgence en l'espèce, de sorte que Madame Clara MOUSSA entend qu'il soit statué sur l'ensemble de ses demandes.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

### III.   Sur les mesures provisoires

A titre liminaire, bien que ce point ne relève pas de la compétence du magistrat conciliateur, Clara MOUSSA conteste catégoriquement les faits de maltraitance qui lui sont reprochés.

Elle ne peut que regretter que son époux, qui avait initialement souhaité introduire une procédure consensuelle, ait subitement fait le choix, à l'évidence stratégique, d'une procédure particulièrement violente à son endroit, allant jusqu'à la faire expulser du domicile conjugal.

Pour y parvenir, Fadi BOUSTANY a communiqué quatre attestations émanant de ses employés ou anciens employés qui devront être appréciées avec les plus expresses réserves dès lors qu'elles ne sont corroborées par aucun élément objectif et que les auteurs nourrissent un ressentiment évident à l'endroit de Clara MOUSSA, en sa qualité d'employeur.

Marco LIBERI, ancien salarié de Fadi BOUSTANY et actuellement en relation de travail avec sa famille, relate un épisode, contesté par Clara MOUSSA, qui aurait eu lieu en octobre 2008 (Pièce adverse 4), soit, pas moins de 12 années avant l'introduction de l'instance.

Séverine GUERIN, employée en 2016 (et durant l'été 2018) relate un épisode, également contesté par Clara MOUSSA, qui aurait eu lieu « *un matin* », à l'occasion duquel cette dernière aurait aspergé le lit conjugal à l'aide d'une « *bombe déodorante* » (Pièce adverse n°5).

Le témoignage d'Audrey GIL, employée six mois en 2016, ressemble davantage à des doléances dans le cadre d'un dossier social, celle-ci se plaignant de ce que son employeur n'aimerait pas la soupe préparée par ses soins. Les conséquences de ses déclarations sont inversement proportionnelles à la gravité de ses accusations (Pièce adverse n°6).

Léonie CITERNE, qui ne précise même pas les dates durant lesquelles elle a travaillé pour la famille BOUSTANY, dénonce « une absence d'implication » de l'épouse (Pièce adverse n°7).

Il devra être relevé que Clara MOUSSA avait sollicité le renvoi de cet employé au motif qu'elle adoptait un comportement particulièrement indécent lorsqu'elle se trouvait sur son lieu de travail, postant sur un réseau social ouvert, des photos à moitié nue prise au domicile de la famille, sur leur lieu de villégiature et parfois même sur le lit de ses employeurs.

> ➢ *Pièce n°17 : constat d'huissier concernant le compte Instagram de Léonie*
> ➢ *Pièce n°18 : échange de SMS entre Fadi BOUSTANY et Clara MOUSSA concernant Léonie et traduction libre*

Manifestement, il ne peut être déduit de ses témoignages de complaisance un quelconque comportement maltraitant, ceux d'autant qu'ils relatent de prétendus **faits anciens de plusieurs années**, établis en juin 2022, soit 6 mois avant le dépôt de la requête et au moment où Fadi BOUSTANY disait vouloir procéder consensuellement.

Ils sont d'ailleurs en totale contradiction avec les témoignages recueillis par Clara MOUSSA qui démontrent son total dévouement.

> ➢ *Pièce n°19 : attestation de Nisrine KARAGULLA du 9 novembre 2022*
> ➢ *Pièce n°20 : attestation de Bernard MOUSSA du 8 novembre 2022*

Clara MOUSSA ne manquera pas de démontrer le mal-fondé desdites accusations et l'amour inconditionnel qu'elle a toujours porté à son époux et se réserve le droit de donner les suites pénales qui s'imposent pour faux témoignages.

A ce stade, Clara MOUSSA est contrainte de formuler les demandes sur mesures provisoires suivantes.

### §1. Le logement

Par ordonnance du 26 octobre 2022, Madame le Président du Tribunal de Première Instance a autorisé immédiatement Fadi BOUSTANY à résider seul au domicile conjugal, faisant défense à Clara MOUSSA de venir l'y troubler.

Pour obtenir une telle mesure, Fadi BOUSTANY a laissé entendre au Magistrat qu'il était sur le point de contracter un bail pour reloger immédiatement son épouse, dans l'immeuble le Florestan.

Cette intention n'était corroborée que par un extrait de la mise en location dudit bien accessible sur le site d'une agence immobilière.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

Aucun document justifiant d'une quelconque diligence de Fadi BOUSTANY visant à réserver cet appartement pour son épouse n'a été versé à la procédure.

Pour des raisons inexpliquées et inexplicables (mais qui peuvent tenir au seul fait qu'aucune démarche n'a jamais été effectuée), le bail au Florestan n'aurait « *pas pu se concrétiser* ».

Il en résulte que Clara MOUSSA a été évincée du domicile conjugal selon Ordonnance du 26 octobre 2022.

Interdite de regagner son domicile à l'issue de ses vacances, elle s'est retrouvée sans logement, avec sa valise de voyage et a dû dans l'urgence organiser son relogement, son époux ne lui ayant proposé que la mise à disposition d'une suite à l'Hôtel Méridien dans laquelle elle n'aurait pas pu accueillir ses enfants.

Cette proposition n'est d'ailleurs intervenue que le 2 novembre (pièce n°7), sur interpellation du Conseil de Clara MOUSSA et alors que celle-ci était déjà de retour à Monaco et n'avait aucun endroit où loger.

Fadi BOUSTANY a également proposé l'installation de la concluante dans l'appartement de 5 pièces situé au Patio Palace à partir du 14 novembre 2022, soit 19 jours après le dépôt de la requête en divorce, aux termes de laquelle il rassurait le Juge quant au relogement de son épouse.

> ➤ *Pièces n° 8 et 9 : courriers officiels du Conseil de Fadi BOUSTANY à celui de Clara MOUSSA des 2 et 3 novembre 2022*

Cette « offre » a été particulièrement mal accueillie par Clara MOUSSA qui indique, depuis des années, à son époux qu'elle ne souhaite pas retourner vivre dans cet immeuble.

> ➤ *Pièces n°21 : Echange de sms entre Clara et Fadi BOUSTANY concernant un déménagement au Patio*

En effet, en 2020, Fadi BOUSTANY, qui se plaignait alors de vivre sur son lieu de travail, avait déjà émis le souhait de retourner au Patio Palace, dans le logement qu'il propose ce jour à son épouse.

A cette époque, le couple est déjà fragilisé par l'état de santé de Fadi BOUSTANY, ses humeurs changeantes, son mépris grandissant vis-à-vis de son épouse.

Cette dernière ne peut se résigner à imaginer que son époux avait alors l'idée de faire déménager la famille dans un appartement beaucoup plus modeste (qui était trop exigu pour accueillir le foyer qui comptait deux enfants de plus mais également une nounou et du personnel de vie), en vue d'une séparation qu'il préméditait déjà.

En tout état de cause, force est de constater que conscient de ce que ce logement ne répondait pas aux besoins de la famille, il a lui-même renoncé à ce projet et maintenu sa famille dans la résidence Métropole.

Au-delà de cette crainte, légitime, il est manifeste que Clara MOUSSA avait justifié son malaise de retourner dans ce logement, où elle a subi de plein fouet les premiers symptômes graves de la maladie de son époux, ses premières chutes, les premiers soins à lui prodiguer, les premiers signes de sa perte d'autonomie.

Elle s'en était alors émue et s'étonne de plus fort de la volonté de Fadi BOUSTANY de le lui imposer deux ans plus tard, dans un contexte judiciaire.

Fadi BOUSTANY justifie son choix par le fait que ▉, l'ainée du couple, y a déjà vécu.

Or, le couple a déménagé en septembre 2010 alors que ▉ n'avait pas trois ans. Elle n'a donc aucun souvenir dans ce logement.

A supposer qu'elle en ait, ils pourraient être aussi désagréables que ceux de sa mère.

L'argument est donc totalement inopérant.

Quoi qu'il en soit, Clara MOUSSA ne peut accepter la proposition de son époux pour des raisons aussi évidentes que profondes.

En effet, l'appartement, qui appartient à l'une des sociétés de l'époux, se trouve sur le même palier que ceux occupés par des membres de la famille BOUSTANY (et notamment le cousin de ce dernier), laquelle n'a pas manqué de marquer son hostilité envers Clara MOUSSA, avant même l'introduction de la présente instance.

Il serait donc particulièrement inconfortable pour elle (mais également pour les enfants) d'avoir pour voisins

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

immédiats des personnes qui nourrissent une certaine animosité.

La proposition apparait d'autant plus indécente que le logement ne correspond aucunement au standing auquel la famille est habituée depuis 12 ans.

L'appartement du Patio Palace avait en effet été quitté par la famille, qui alors qu'elle n'avait encore qu'un seul enfant, avait déjà considéré qu'il n'était plus adapté à ses besoins.

La famille s'est alors installée dans un appartement extrêmement luxueux se trouvant dans la Résidence Le Métropole, et comptant pas moins de 410 m², dans le quartier le plus prestigieux de la Principauté.

Cet appartement offre, outre le luxe du logement, des prestations hôtelières qui ont permis à la famille de disposer d'un confort incommensurable et extraordinaire.

Monsieur BOUSTANY y vit désormais seul.

Le coût du loyer d'un tel logement représente une somme mensuelle de plus de 100.000 euros, hors frais de service lesquels sont de plusieurs dizaines de milliers d'euros.

> ➢ *Pièce n°22 : Bail à loyer « Résidence du Métropole » pour un appartement équivalent au logement attribué à Fadi BOUSTANY avec un loyer annuel d'environ 1.100.000 euros*

Il est inconvenant de la part de Fadi BOUSTANY de proposer à sa femme, ses trois enfants et la nounou de loger dans un appartement ayant une superficie moitié moins élevée et une valeur locative du cinquième de la valeur locative du logement qu'il occupe désormais seul avec ses employés.

Cette situation serait d'autant plus inéquitable que les enfants du couple continueront à bénéficier de ce logement dès qu'ils seront auprès de leur père.

Les enfants doivent donc disposer d'un logement équivalent lorsqu'ils sont avec leur mère, de sorte que leurs habitudes de vie et leur confort soient maintenus, autant que possible.

Le procédé mis en œuvre ne peut dans tous les cas pas se faire au mépris du droit au respect de sa vie privée et familiale qui garantit le droit essentiel pour chacun de choisir son lieu de vie.

Il n'est ni juste ni raisonnable que Fadi BOUSTANY, qui a la jouissance du domicile conjugal, et qui en a déjà exclu son épouse, entende désormais imposer unilatéralement à celle-ci (et aux enfants communs) de vivre dans un appartement qu'il a lui-même fait rénover et meubler dans lequel la famille ne pourra jamais se sentir « chez elle ».

C'est de façon parfaitement légitime que Clara MOUSSA souhaite pouvoir choisir, avec ses enfants, de 9 et presque 15 ans, l'endroit dans lequel ils seront amenés à vivre pour une période indéterminée, mais dont on peut craindre qu'elle sera de plusieurs années.

Il est donc particulièrement regrettable que Fadi BOUSTANY entende imposer à son épouse son futur logement sans même envisager une quelconque autre solution, ni la moindre considération du ressenti de sa famille et l'intérêt des enfants.

Il est incontestable qu'en pressurisant son épouse pour une installation au Patio, 48h00 avant l'audience de conciliation, par l'intervention d'un huissier, Fadi BOUSTANY tente ni plus ni moins de réduire autant que faire se peut les obligations alimentaires qui seront inévitablement mises à sa charge par le Juge conciliateur.

De son côté, pour pallier le choix arbitraire de Fadi BOUSTANY, Clara MOUSSA a organisé avec les enfants plusieurs visites qui les ont conduits à retenir un bien dans lequel ils sont parvenus à se projeter.

Clara BOUSTANY produit ainsi une offre de location qui pourrait lui convenir ainsi qu'aux enfants concernant un appartement au « Balmoral » avec un loyer mensuel de 80.000 euros.

> ➢ *Pièce n°23 : Offre de location pour l'appartement « Balmoral » et fiche technique du bien*

Les frais pour accéder au logement seront de 650.000 euros décomposés comme suit :

- € 210.000,00 dépôt de garantie
- € 210.000,00 paiement du loyer et des charges pour la période du 21 novembre 2022 au 21 février 2023.
- € 1.500,00 frais d'huissier, état des lieux,
- € 84.000,00 honoraires d'agence,

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

- € 16.800,00 TVA sur honoraires d'agence
- € 126.000 ameublement

  ➢ *Pièce n° 24 : devis d'ameublement de Tania Architecture*

A ces dépenses, il conviendra en outre d'ajouter les frais inhérents à l'achat de la vaisselle, du linge de maison, et de façon générale de tous les objets nécessaires au quotidien d'un foyer comptant trois enfants.

Il conviendra en conséquence de condamner Fadi BOUSTANY à régler à Clara MOUSSA, une somme de 650.000 euros au titre du devoir de secours, pour lui permettre de se reloger, le montant devant lui être versé à compter de la décision à intervenir exécutoire sur minute.

**§2. Les mesures relatives aux enfants**

**A. L'autorité parentale**

Les parents exerceront conjointement l'autorité parentale et devront ensemble prendre les décisions importantes concernant les enfants.

A ce titre, il convient de souligner que les parents sont d'ores et déjà en communication directe en vue du choix d'un pédopsychiatre pour préserver au mieux l'équilibre des enfants, nonobstant la séparation parentale brutale.

**B. La résidence des enfants**

Fadi BOUSTANY ne craint pas de solliciter aux termes de ses écritures, à titre principal, dans la seule hypothèse ou Clara MOUSSA accepte sa proposition d'être relogée au Patio PALACE, l'instauration d'une résidence alternée.

Conscient des dispositions de l'article 303-3 du Code Civil, interdisant la résidence alternée en l'absence d'accord des deux parents, il propose qu'à défaut, la résidence soit fixée au domicile de la mère avec des droits de visite et d'hébergement dits « classiques » en sa faveur.

Si en revanche, Clara MOUSSA refuse la seule offre de relogement qui lui est faite par son époux, Fadi BOUSTANY estime devoir solliciter la fixation de la résidence des enfants à son domicile et l'instauration d'un droit de visite et d'hébergement classique au profit de la concluante.

Ainsi, soit Clara MOUSSA accepte de se soumettre à un état de dépendance imposé par son époux et Fadi BOUSTANY consent à ce que la résidence des enfants soit fixée chez elle, soit elle le refuse et s'expose, en représailles, à ce qu'il mette tout en œuvre pour que la résidence des enfants soit fixée chez lui, avec un droit de visite et d'hébergement réduit à 6 nuits par mois pour la mère.

Cette position est tout à fait révélatrice des pressions subies par la concluante au cours du mariage, et de la volonté de Fadi BOUSTANY de conserver le contrôle de sa vie notamment en la contraignant à vivre dans l'appartement qu'il a décidé de lui assigner.

La résidence des enfants ne saurait être subordonnée à l'acceptation ou non par leur mère, de la proposition de relogement formée par le père, alors que celui-ci a parfaitement les moyens financiers d'assumer le paiement d'un loyer correspondant à un logement conforme au train de vie des enfants.

Elle doit être fixée, dans seul intérêt supérieur des enfants, auprès du parent qui sera le plus apte à assumer leur quotidien, assurer leur santé et leur sécurité tant physique que psychologique.

En l'espèce, Clara MOUSSA s'oppose à la mise en place d'une résidence alternée, celle-ci n'étant pas conforme à l'intérêt des enfants âgés de 9 et 14 ans.

Elle sollicite que la résidence des enfants, conformément à la demande de Fadi BOUSTANY formée, au cas où elle accepterait sa proposition de relogement, soit fixée au domicile de la mère.

Il est opportun de souligner que par cette proposition Fadi BOUSTANY reconnait expressément que Clara MOUSSA est parfaitement en mesure de s'occuper des trois enfants, comme elle l'a toujours fait pour les trois enfants.

Par la position qu'il soutient, Fadi BOUSTANY reconnait implicitement ne pouvoir lui-même assumer la charge quotidienne des trois enfants, du fait, notamment, de son état de santé.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

En effet, Fadi BOUSTANY a malheureusement perdu toute autonomie et nécessite lui-même une assistance paramédicale assumée par des professionnels qui se relayent auprès de lui jour et nuit.

Il ne peut aucunement avoir la charge des enfants dont les plus jeunes sont âgés de seulement 9 ans sans l'assistance constante d'un tiers.

La maladie est en tout état de cause particulièrement anxiogène et difficile à gérer au quotidien.

Il ne ferait donc aucun sens d'ordonner une résidence alternée qui conduirait à ce que les enfants soient pris en charge une semaine sur deux par des professionnels et non par un parent parfaitement disponible et dévoué.

Pour les exactes mêmes raisons, Clara MOUSSA considère que la résidence des enfants doit être fixée à son domicile.

Fadi BOUSTANY semble (indépendamment du chantage opéré) reconnaître que l'intérêt des enfants est de demeurer auprès de leur mère puisqu'il propose, à défaut de résidence alternée, que leur résidence soit effectivement fixée au domicile maternel.

Fadi BOUSTANY sait que Clara MOUSSA a été amenée à s'occuper seule des trois enfants du couple presque depuis leurs naissances.

Elle a toujours assumé son rôle de mère avec affection et attention, ce qui n'est absolument pas remis en cause par Fadi BOUSTANY.

Elle représente aujourd'hui le seul repère rassurant des enfants qui ont besoin d'elle au quotidien, ayant assumé la totalité des rendez-vous médicaux, les entretiens scolaires, le suivi des enfants dans tous les domaines, y compris sportifs. Vu l'état de santé de leur père, elle a le plus souvent était seule à accompagner les enfants tant dans leur scolarité que dans leurs activités extrascolaires, en envoyant presque quotidiennement des photos de différentes activités des enfants à leur père pour intégrer celui-ci dans la vie de la famille dans toute la mesure du possible.

> ➢ *Pièce n°25 : capture d'écran d'envoi des photos des enfants par Clara MOUSSA à Fadi BOUSTANY*
> ➢ *Pièce n° 26 :  attestation d'Océane Skupien du 13 novembre 2022*
> ➢ *Pièce n°26 bis : attestation Sybille SABET du 14 novembre 2022*
> ➢ *Pièce n° 27 : attestation du docteur TOLASANO du 14 novembre 2022*

Les enfants ont vécu le traumatisme de la séparation, dans des conditions particulièrement brutales.

Ils ont aujourd'hui besoin de stabilité et d'une attention accrue qui ne saurait être déléguée à des nourrices, le père étant dans l'incapacité physique d'apporter une telle attention à ses enfants.

A ce jour, les enfants sont logés, à titre provisoire, à Monaco, chez des amis de leur mère qui sont eux-mêmes absents, et qui mettent à disposition leur appartement provisoirement.

Fadi BOUSTANY qui a toujours su où ses enfants étaient logés, contrairement aux termes des correspondances officielles de son avocat, n'a jamais soulevé la moindre contestation, reconnaissant ainsi que l'intérêt des enfants est parfaitement préservé.

Pour s'en convaincre, il sera précisé qu'à la date du 2 novembre 2022, alors que Clara MOUSSA rentre de New York et que les enfants rentrent de vacances passées avec leur père, ces derniers se présentent au domicile provisoire de la mère, accompagnés de leur nourrice.

Ils demanderont à rester auprès de leur mère.

Fadi BOSUTANY a toujours été informé du choix de ses enfants, à telle enseigne qu'il a consenti à ce que la nourrice effectue plusieurs allers-retours entre les domiciles paternel et maternel pour récupérer les affaires des enfants.

> ➢ *Pièce n°28 : attestation d'Aleksandra WISNIEWSKA du 12 novembre 2022*

Dès le lendemain, Clara MOUSSA s'inquiétait du souhait de Fadi BOUSTANY de voir ses enfants mais n'obtenait aucune réponse.

Était finalement organisé un déjeuner le dimanche 6 novembre à l'issue duquel, naturellement et sans opposition, les enfants ont été ramenés auprès de leur mère.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

Dans les jours qui ont suivi, Clara MOUSSA a à nouveau interrogé le père sur ses intentions avec les enfants et finissait par être informé de son refus de les prendre pour le déjeuner du mercredi alors même qu'il s'agissait d'une habitude de famille.

Fadi BOUSTANY n'a pris les enfants que le dimanche suivant, le 13, le temps d'un déjeuner.

En 13 jours Fadi BOUSTANY n'a donc demandé à partager que deux déjeuners avec ses trois enfants n'a partagé aucune nuitée avec eux.

> ➢ *Pièce n°9 : échange de SMS entre Clara et Fadi BOUSTANY depuis le 2 novembre 2022*

Il est donc regrettable qu'il fasse écrire par son conseil qu'il n'aurait pas accepté que les enfants restent auprès de leur mère.

Dans ces conditions, il conviendra, quelle que soit la décision de la Juridiction quant au logement de Clara MOUSSA, de fixer la résidence des enfants auprès de leur mère.

### C. Sur les droits de visite et d'hébergement des enfants

Clara MOUSSA s'accorde sur l'organisation du droit de visite et d'hébergement proposé par le père, et consent à ce qu'il ait ses enfants une fin de semaine sur deux du vendredi après l'école au lundi matin à charge pour lui de faire récupérer les enfants à l'école et de les y ramener.

Elle consent en outre à ce qu'il dispose des petites vacances d'été.

Elle souhaite en revanche que durant les vacances estivales, le père dispose de deux semaines de vacances dont il pourra fixer les dates au plus tard deux mois à l'avance.

Le père pourra voir ses enfants selon les modalités prévues en périodes scolaires sur le reste de la période estivale à l'exclusion de la période durant laquelle les enfants seront à l'étranger avec leur mère et sans que cette période n'excède un mois.

Néanmoins, compte tenu de l'état de santé de Fadi BOUSTANY il conviendra d'ordonner que les enfants soient toujours accompagnés de leur nourrice habituelle, Madame Aleksandra WISNIEWSKA qui demeurera auprès d'eux pendant toute la durée du droit de visite et d'hébergement.

A titre infiniment subsidiaire, dans l'hypothèse où la Juridiction considèrerait devoir être plus amplement informée sur les besoins des enfants, et les conditions d'accueil au domicile des deux parents, il conviendra d'ordonner l'instauration d'une enquête sociale.

### 4. La part contributive à l'éducation des enfants

Les enfants, âgés de presque 15 ans et 9 ans, sont scolarisés à FANB.

Ils disposent d'un train de vie dispendieux, à l'instar de leurs parents, bénéficiant des services hôteliers ( SPA, soin esthétique, room service).

Ils se déplacent avec un chauffeur privé ou avec les voitures et chauffeurs d'hôtel.

Ils bénéficient en outre de cours particuliers de suivi, cours d'arabe, cours de chant pour █████, cours de guitare pour █████ et █████.

█████ pratique la danse à haut niveau à DCOMPLEX23, l'école la plus prestigieuse.

Les garçons sont inscrits à différents sports, karaté, football, …

Les enfants bénéficient également régulièrement de cours particuliers de natation au Beach Club où ils sont abonnés à l'année et de tennis au Country.

Ils prennent encore des cours particuliers de ski de montagne et nautique ainsi que de surf.

Ils suivent également des cours particuliers d'équitation à Biarritz pendant leurs vacances.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

Ils suivent des stages de voile régulièrement au Yacht Club de Monaco où leurs parents sont abonnés.

Ils disposent, chaque année, d'une loge au Cirque de Monaco.

█ participe à des « summer camps » à New-York, depuis l'été 2022.

Leurs anniversaires sont toujours organisés avec des animateurs privés et de nombreux invités justifiant des coûts de près de 10.000 euros pour l'évènement le plus récent.

Ils voyagent tout au long de l'année et résident dans des palaces.

Ainsi, le train de vie des enfants, sur les trois dernières années, tel que Clara MOUSSA a pu le retracer, s'élève ainsi à plus d'1.300.000 euros.

| Année | Vêtements | Loisirs | Jouets/anniversaires | Scolaire | Frais fixes/argent de poche | santé | TOTAL |
|---|---|---|---|---|---|---|---|
| 2019 | 23 710,56 € | 82 910,00 € | 12 500,15 € | 29 640,00 € | 158 660,32 € | 16 183,52 € | 323 604,55 € |
| 2020 | 40 030,83 € | 91 979,35 € | 12 274,85 € | 36 640,00 € | 155 452,00 € | 16 000,00 € | 352 377,03 € |
| 2021 | 6 209,13 € | 88 316,00 € | 10 019,96 € | 40 640,00 € | 155 452,00 € | 18 537,72 € | 319 174,81 € |
| 2022 | 11 244,33 € | 96 151,10 € | 7 878,52 € | 39 640,00 € | 155 452,00 € | 16 100,00 € | 326 465,95 € |
|  |  |  |  |  |  |  |  |
|  | 81 194,85 € | 359 356,45 € | 42 673,48 € | 146 560,00 € | 625 016,32 € | 66 821,24 € | 1 321 622,34 € |
|  |  |  |  |  |  |  |  |

**RECAPITULATIF DEPENSES ENFANTS**

Il ne peut être considéré qu'il s'agit d'un budget exhaustif dès lors qu'il ne prend en considération que les dépenses portées à la connaissance de la mère.

Il représente néanmoins la somme mensuelle de plus de 30.000 euros.

Par ailleurs, la famille dispose par ailleurs :

- d'un chauffeur à la disposition constante des enfants. En réalité, Fadi BOUSTANY embauche trois chauffeurs lesquels se relaient pour être constamment au service de la famille
- d'une nourrice à temps plein, Alexandra qui perçoit actuellement des revenus de 3.500 euros nets par mois ( soit 5.000 euros charges comprises) et d'une nourrice à mi-temps qui perçoit un salaire de 1.500 euros ( soit 2.500 euros charges comprises)
- de services divers ( soins esthétiques et massages pour █ ) d'un montant mensuel de 1.000 euros en moyenne actuellement assumé par la SCI METROPOLE

Les enfants disposent d'un accès gratuit à tous les services de l'hôtel Le Métropole, qu'il s'agisse de points de restauration, kids club, piscine, spa, room service…

Les enfants doivent également bénéficier d'une assurance santé privée de 16.000 euros par an pour les trois enfants.

Les enfants doivent pouvoir continuer à bénéficier, auprès de leur mère, du même train de vie que celui qui était le leur pendant la vie commune, avec maintien des vacances et autres habitudes de vie.

Clara MOUSSA entend donc embaucher une nourrice et un chauffeur pour l'assister.

Il serait pertinent que la nourrice la plus proche des enfants, Aleksandra, soit embauchée par la mère ( par le biais d'une reprise de son contrat de travail), ce qui suppose l'accord de Fadi BOUSTANY, actuel employeur.

Clara MOUSSA consent et sollicite à ce que la nourrice suive les enfants lorsqu'ils sont avec leur père pour maintenir autant que possible leurs habitudes.

Ce point ne modifie en rien les mesures financières, les employés générant un cout mensuel d'au moins 8.000 euros.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

Ainsi, Clara BOUSTANY est bien fondée à solliciter la somme de 60.000 à titre de part contributive à l'éducation des trois enfants, soit 20.000 euros par enfant.

Fadi BOUSTANY assumera par ailleurs les frais relatifs à leur scolarité (inscription, cours particuliers, uniformes, cantine…), les abonnements sportifs et tenues nécessaires, les dépenses de santé (en ce compris l'assurance santé, mutuelle et frais médicaux restant à charge).

### §3. Sur les mesures financières

L'article 202-1 du Code civil prévoit que les mesures provisoires peuvent concerner des demandes d'aliments, lesquelles trouvent leur fondement dans le devoir de secours et d'assistance que se doivent les époux jusqu'au prononcé du divorce.

Cette pension doit permettre dans la limite des moyens de l'autre époux de maintenir un niveau de vie équivalent, ces demandes doivent être fondées sur les revenus et patrimoine des époux mais aussi les dépenses engendrées par la vie commune.

#### A.  La pension alimentaire

**1.  Situation financière et patrimoniale de Clara MOUSSA**

En avril 2006, Clara MOUSSA a quitté son pays d'origine pour s'installer à Monaco. Elle a alors cessé de travailler pour la société MYTCO, créée par son père, dont elle est restée actionnaire.

Elle ne reçoit ni dividendes ni revenus, ces derniers étant réinvestis, en raison de la situation au Liban depuis 2010.

> ➢ *Pièce n° 29 : attestation de l'expert-comptable du 11 novembre 2022*

Depuis son arrivée à Monaco, elle n'a plus eu aucune activité salariée.

Elle a néanmoins activement soutenu et assisté son époux dans ses affaires.

En 2015, elle a constitué avec Camille BIANCHERI, grâce au soutien financier de son époux, à hauteur de 250.000 euros, la SARL MONACOPOPS dont elle a été associée minoritaire pour ne détenir que 10% des parts.

Elle n'a jamais perçu de dividendes.

La société a été dissoute amiablement le 31 juillet 2017.

> ➢ *Pièce n° 30 : extrait du journal de Monaco concernant la constitution de la SARL MONACOPOS*
> ➢ *Pièce n°31 : extrait du registre du commerce de la SARL MONACOPOPS et extrait du journal de Monaco*

Clara MOUSSA n'a donc jamais eu, durant son union, de ressources ni de revenus personnels.

Elle ne dispose d'aucun patrimoine propre ni d'aucune épargne personnelle.

> ➢ *Pièce n° 32 : attestation banque du 14 novembre 2022*

**2.  Situation financière et patrimoniale de Fadi BOUSTANY**

Il est de notoriété publique que la famille BOUSTANY est propriétaire d'un parc immobilier extraordinaire à Monaco et qu'elle compte parmi les 15 plus fortunées de la Principauté.

Cette fortune colossale a été constituée pour grande partie par les parents de Fadi BOUSTANY qui ont créé le Métropole à Monaco.

Fadi BOUSTANY est l'héritier, avec son frère, Majid, et sa sœur, Dania, de leur père Nabil BOUSTANY, décédé en 2009.

Il a repris majoritairement, avec son frère, les activités de son père, notamment le Métropole (composé de l'hôtel-palace, de la résidence avec des appartements de luxe, d'un parking contenant plus de 130 places, dont une seule place à la vente est de 500,000 euros, et d'un centre commercial avec de nombreuses boutiques à côté de la place du Casino à Monaco), qu'il a largement fait prospérer.

13

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

D'après les informations dont Clara BOUSTANY dispose, son mari est actionnaire, directement ou indirectement, à 75 % de ce complexe Métropole, les 25% restant appartement à son frère Majid BOUSTANY.

Sa fortune s'élève à plusieurs milliards d'euros.

Le seul bien du métropole, exclusion faire de la résidence métropole, est actuellement évalué à 2,95 milliards, alors qu'il était valorisé à hauteur de deux milliards en 2015.

> ➢ *Pièce n°33 : fiche de l'agence Monte calo Real Estate*
> ➢ *Pièce n°34 : captures d'écran démontrant que l'Hôtel Métropole est en vente pour 2,95 milliards d'euros*
> ➢ *Pièce n°35 : extraits du site internet hotelsmag.com au sujet de Fadi BOUSTANY*
> ➢ *Pièce n° 36 : mail de Monica SOAVE du 19 mai 2015*

A la connaissance de Clara MOUSSA, le patrimoine de Fadi BOUSTANY et ses intérêts économiques sont répartis à travers le monde et se chiffrent à plusieurs milliards d'euros. Il appartiendra à Fadi BOUSTANY de renseigner son épouse sur tous les détails de ce patrimoine dans le cadre de la procédure qu'il a engagée.

Il apparait néanmoins au travers de quelques recherches le concernant comme actionnaire et/ou gérant de nombreuses sociétés civiles immobilières de droit monégasque parmi lesquelles :

o   HECTOR OTTO
o   LES JARDINS HECTOR OTTO
o   DES REVOIRES
o   DES SPELUGUES
o   METROPOLE

Ces sociétés détiennent divers bien immobiliers à Monaco qui ne sont toutefois pas représentatifs de la fortune réelle de la famille BOUSTANY, organisée par l'entremise des trusts et sociétés-écrans dans des juridictions offshores.

> ➢ *Pièce n°37 : certificat hors formalités du 10 août 2022 concernant la SCI SAINT ROMAN 2010*
> ➢ *Pièce n° 38 : certificat hors formalités du 11 août 2022 concernant la SCI METROPOLE*
> ➢ *Pièce n° 39 : certificat hors formalités du 11 août 2022 concernant la SCI LES JARDINS HECTOR OTTO*
> ➢ *Pièce n° 40 : certificat hors formalités du 23 août 2022 concernant la SCI LES SPELUGUES*
> ➢ *Pièce n°41 : fiche de location de l'appartement situé « le sardanapale »*

Monsieur Fadi BOUSTANY est par ailleurs administrateur et détient des participations dans :

o   SAM METROPOLE GROUP – valorisée en septembre 2012, selon J.P. MORGAN 32.779.642 €.

> ➢ *Pièce n° 42 : extrait du registre du commerce concernant la SAM METROPOLE GROUP*
> ➢ *Pièce n° 43 : estimation effectué par J.P MORGAN de la société SAM METROPOLE GROUP*

o   SAM METROPOLE REAL ESTATE –président administrateur délégué
o   SAM METROPOLE ADMINISTRATION.  - président administrateur délégué

o   SAM HOTEL METROPOLE- président administrateur délégué

> ➢ *Pièce n° 44 : extrait du registre du commerce concernant la SAM METROPOLE REAL ESTATE*
> ➢ *Pièce n° 45 : extrait du registre du commerce concernant la SAM METROPOLE ADMINISTRATION*
> ➢ *Pièce n° 46 : extrait du registre du commerce concernant la SAM HOTEL METROPOLE*

Fadi BOUSTANY a organisé son patrimoine dans une totale opacité, les biens détenus étant acquis et revendus à différentes structures sociales opaques dont il demeure néanmoins le bénéficiaire économique.

Il est par ailleurs à l'origine de la Fondation éponyme entre Monaco et la Suisse.

Ladite fondation fait des dons particulièrement importants et finance plus de 120 programmes d'envergure.

> ➢ *Pièce n°47 : extraits du site internet de la fondation détenue par Monsieur Fadi BOUSTANY*

Il détient également un important patrimoine immobilier au Liban.

14

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

Il détient par ailleurs un important patrimoine mobilier et notamment :

- o Des véhicules pour une valeur de l'ordre de 370.000 euros (une BMW modèle X5, une BMW série 7, deux Mercedes modèle VIANO, une Audi A3, une Mercedes classe E).

> *Pièce n° 48: certificats d'immatriculation*

- o Des œuvres d'art exposées au domicile conjugal d'un montant de presque 450.000 €, notamment une tapisserie Robert Indiana (Love) estimée à 12.000 euros, un tableau Julien Opie Verity walking de 11.500 euros, et Luc and Ludivine à 5.100 euros, une tapisserie Andy Warhol à 18.000 euros, une cheminée antique estimée à 4.850 euros une œuvre de Shi Lifeng Canvas de 55.000 euros, une de Victor Vasarely Canvas de 73.770 euros et meubles de Coulombs pour un montant de 255.000 euros.

\*\*\*

Compte tenu de la complexité des montages mis en place et du caractère international des structures sociales, Clara MOUSSA n'est pas en mesure d'estimer l'ampleur du patrimoine, qu'elle sait néanmoins colossal, de son époux.

Ce patrimoine lui a, en tout état de cause, permis d'assurer un train de vie hors norme à l'ensemble du foyer pendant près de 20 ans.

### 3. <u>Le train de vie du couple</u>

L'article 181 du code civil impose à tous les époux le respect d'un devoir de secours qui prend la forme d'une pension alimentaire au cours de l'instance en divorce, au visa de l'article 202-1 3° et 4°.

Il est de jurisprudence constante que le devoir de secours, pendant l'instance en divorce, a pour but de maintenir, le niveau de vie qui était celui des époux pendant la vie commune. Il a ainsi été jugé que :

« *l'appréciation de la demande d'aliments prévue par l'article 202-1 du code civil doit tenir compte des besoins du créancier et des facultés contributives du débiteur* ». (Cour de Révision, 31 mai 2013, Mme v BO épouse CU. c/M.s.CU)

La Cour d'appel de Monaco a précisé que :

« *la pension alimentaire allouée au conjoint sur le fondement du devoir de secours doit assurer à celui-ci __le même niveau de vie auquel il était en droit de prétendre durant la vie du ménage__ compte tenu des facultés de l'autre conjoint et de ses facultés propres* ». (CA, 8 janvier 2013 identifiant base de données 10073)

Elle a depuis confirmé que :

« *par application des dispositions de l'article 202-2 du code civil, la détermination d'une pension alimentaire tient compte des besoins du créancier d'aliments et des facultés contributives du débiteur, de tels besoins étant engendrés par les nécessités de la vie courante  et évalués, en tenant compte, dans une certaine mesure, du train de vie des époux durant la vie commune ;*

*Attendu qu'une telle appréciation, destinée à maintenir durant le cours de l'instance en divorce une vie quotidienne sensiblement équivalente à celle des époux durant leur relation conjugale* » (CA 10 novembre 2015 identifiant base de données 14227)

Elle a ainsi considéré que :

« *Mme PI. se trouve désormais dans une situation de besoin, en rupture avec le train de vie très élevé qui était le sien auparavant ;*

*Attendu qu'au regard de ces éléments, des besoins de la vie courante de Mme PI., des facultés contributives de M.PI, de leur train de vie pendant la vie commune, il y a lieu de faire droit à la demande de Mme PI.* » (CA 19 décembre 2017 Madame r.SC épouse PI. c/ Monsieur PI.)

*Le pays voisin a également jugé que :*

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

« *Mais attendu qu'après avoir relevé les ressources et les charges de chacun des époux, l'arrêt retient que les revenus de Dame A. n'étaient pas suffisants pour lui assurer le niveau d'existence auquel elle pouvait prétendre, compte tenu des facultés du mari* » (Cour de cassation française, 2ème Civ., 7 mai 1980, n°78-15.739, Bull. II n°97)

Le devoir de secours doit ainsi être envisagé sous l'angle du besoin à l'aune du niveau de vie des époux pendant le mariage, et plus largement la vie commune.

*****

En l'espèce, le couple s'est initialement installé dans un appartement de cinq pièces, situé au Patio Palace, mis à sa disposition par la SCI LES JARDINS HECTOR OTTO dont il a été démontré les liens avec Fadi BOUSTANY.

Depuis 2010, le couple a emménagé dans un appartement extrêmement luxueux de 8 pièces, de plus de 410 m², situé au 9ᵉ étage dans la Résidence du METROPOLE, 1 avenue des Citronniers, tous frais courants payés et mis gracieusement à sa disposition par la SCI DU METROPOLE.

> ➢ *Pièce n° 49 : Photographies du domicile conjugal*

La famille bénéficie en outre des services de l'Hôtel du METROPOLE (services hôteliers, conciergerie, repas préparés par les chefs livrés deux fois par jour, voiturier, pressing outre spa, gym, massages, salon esthétique, room service à toute heure), lesquels sont pris en charge par la SCI METROPOLE.

S'il est difficile de valoriser un tel confort de vie en résidence hôtelière de luxe et de chiffrer les prestations dont la famille a pu bénéficier, on pourrait considérer qu'elles ne représentent pas moins de 30.000 euros par mois, montant décomposé comme suit :

| | |
|---|---|
| Transports avec voiturier | 5.000 |
| Room service | 22.000 |
| Bien-être | 3.000 |

En outre, Fadi BOUSTANY couvre par ses diverses sociétés ou personnellement, les frais relatifs au logement, téléphone, internet, …ainsi que les frais médicaux et d'assurance privée.

Le quotidien de la famille est par ailleurs amélioré par la présence de deux nounous, l'une qui vit au domicile et la seconde qui travaille à mi-temps, de trois chauffeurs, de deux femmes de ménage, outre le personnel particulier de Fadi BOUSTANY et tout le personnel du METROPOLE à leur disposition.

La famille n'a donc jamais eu à effectuer la moindre tâche ménagère en 12 ans de vie commune.

Au-delà du quotidien particulièrement confortable dont la famille a pu bénéficier, Fadi BOUSTANY a toujours été généreux avec son épouse, lui offrant des présents de très grande valeur et notamment lui permettant de constituer une collection de sacs Hermès vouée à être transmise à leur fille ███.

Fadi BOUSTANY a par ailleurs permis à sa famille de faire des voyages de rêve, à chaque période de vacances scolaires, en bénéficiant des vols privés et ayant accès à des expériences uniques (telles que des loges privées dans des théâtres, privatisation des endroits à visiter, etc.).

La famille a ainsi parcouru les Etats-Unis, s'est rendue à Dubaï, dans toute l'Europe, organisé des séjours au ski dans des palaces dans les stations mythiques.

A titre d'exemple, la famille a durant les dernières vacances en commun loué une résidence de luxe à Saint Tropez pour un montant de 80.000 euros la semaine et a sollicité les services d'un chef et du personnel de maison.

Les dépenses de vacances de la famille ont toujours été exposées par Fadi BOUSTANY, de sorte que la concluante est empêchée de justifier de l'ensemble du budget vacances, qu'elle établit néanmoins à hauteur minimum de € 300.000,00.

Ce montant doit être doublement pondéré.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

D'une part, Clara MOUSSA n'a pas été en mesure de retracer tous les frais mais uniquement ceux pour lesquels des factures avaient été établies (à l'exclusion des restaurants et des dépenses réglées directement par Fadi BOUSTANY).

D'autre part sur la période de référence (2018-juin 2022) le budget voyage – comme l'ensemble des dépenses- a été affecté par la crise sanitaire pendant près de deux ans.

Le budget annuel moyen -justifié- pour les vacances a été de l'ordre de  400.000 euros.

L'on peut plus raisonnablement considérer que le budget des vacances est de l'ordre de 400.000 euros par an.

Clara MOUSSA a toujours, en sus de ce confort de vie, pu dépenser librement, ce jusqu'à la fin de l'année 2018.

En effet, elle disposait notamment de l'AMEX Centurion de son époux pour ses dépenses personnelles et celles des enfants.

N'ayant pas accès aux relevés de compte, elle n'est pas en mesure de justifier de ses dépenses qu'elle estime à au moins 30.000 euros par mois.

Son époux lui faisait par ailleurs, en sus, des virements réguliers son compte personnel ouvert au LCL qu'il était le seul à alimenter, couvrant au besoin les dépenses exceptionnelles de l'épouse.

A compter de 2019, manifestement déjà animé par le souhait de se séparer de son épouse, Fadi BOUSTANY a progressivement mais sensiblement modifié les habitudes du foyer.

Il a soudainement effectué sur le compte bancaire de la concluante des virements réguliers limités à 9.000 euros tous les mois et 13.000 euros par trimestre, intitulés « pension alimentaire » lesquels ont supplanté les virements aléatoires effectués au gré des besoins du foyer.

Il a par la suite réduit l'accès à la carte AMEX avant de la lui retirer purement et simplement, sans aucune explication.

Ces modifications ont été tristement concomitantes à la dégradation de son état de santé et aux griefs infondés faits à l'épouse, lui donnant ainsi le sentiment de sanctions financières.

Malgré les restrictions imposées par l'époux et la diminution à dessein de son train de vie, les dépenses de Clara pour ses seuls besoins (à titre d'argent de poche) sur la période de référence, représentent une somme globale de 1.800.000 euros, soit 30.000 euros par mois.

> ➢ *Pièce n° 50: Récapitulatif des postes de dépense de Clara MOUSSA*
> ➢ *Pièce n° 51: Relevés du compte personnel de Clara MOUSSA*

Le budget annuel global de la famille s'élève ainsi, <u>exclusion faite des dépenses personnelles de Fadi BOUSTANY</u> et de celles propres aux enfants qui seront abordées au chapitre les concernant, à la somme de 3.120.000 euros, **soit 260.000 euros par mois**, décomposée comme suit :

| année | total | Vêtements | bijoux | sacs | loisirs /abonnements/contribu | frais personnel | frais fixes | alimentaire | voyages | sante | entretien véhicule | divers rc | cosmétique | dépenses chien |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 2 879 301,67 € | 106 039,96 € | - € | 34 486,35 € | 70 501,77 € | 317 540,00 € | 1 825 710,97 € | 15 284,36 € | 374 422,66 € | - € | - € | 130 233,77 € | 5 081,83 € | |
| 2019 | 2 772 864,76 € | 116 344,57 € | - € | 19 776,90 € | 64 508,35 € | 318 097,50 € | 1 824 295,68 € | 22 312,97 € | 295 783,38 € | - € | - € | 99 910,37 € | 11 835,04 € | 1 584,30 € |
| 2020 | 2 755 592,34 € | 82 504,37 € | - € | 44 799,00 € | 71 034,06 € | 322 320,80 € | 1 821 286,55 € | 39 938,30 € | 264 916,47 € | - € | - € | 99 547,92 € | 9 244,87 € | 1 859,90 € |
| 2021 | 2 580 079,02 € | 101 224,20 € | - € | 22 510,00 € | 60 481,61 € | 316 240,00 € | 1 813 673,76 € | 42 152,05 € | 135 316,25 € | - € | - € | 78 380,22 € | 10 100,93 € | 146,80 € |
| 2022 | 2 561 072,46 € | 36 780,48 € | - € | 21 675,00 € | 63 332,74 € | 322 380,00 € | 1 821 393,84 € | 29 395,74 € | 213 667,89 € | - € | - € | 49 804,32 € | 2 642,45 € | 66,00 € |
| | | | | | | | | | | | | | | |
| TOTAUX | 14 371 925,09 € | 442 893,58 € | 666 940,00 € | 143 247,25 € | 329 858,53 € | 1 596 578,30 € | 9 106 360,80 € | 149 083,42 € | 1 284 106,65 € | 154 002,14 € | - € | 457 876,60 € | 38 905,12 € | 2 072,70 € |

Pour l'avenir, les dépenses propres à Clara BOUSTANY pourront être évaluées à la somme mensuelle de 205.600 euros décomposée comme suit :

- 80.000 euros au titre du loyer logement et charges afférentes,
- 12.000 euros au titre des charges fixes (alimentation, assurance, électricité, eau, abonnements, téléphone…)
- 30.000 euros pour ses dépenses personnelles (vêtements, loisirs, esthétique…)
- 33.000 euros pour les voyages (budget annuel proratisé)

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

- 30.000 euros au titre des services offerts par l'Hotel (bien-être, voiturier, service pressing)
- 15.000 euros au titre des frais de personnel de maison (femme de ménage, cuisiner, chauffeur)
- 1.600 euros au titre de l'assurance de santé privée (20.000 euros par an)
- 2.500 euros au titre du leasing d'un véhicule catégorie luxe (conforme à ce dont elle disposait jusqu'alors) et entretien

La pension alimentaire à la charge de Fadi BOUSTANY sera fixée à la somme de 205.000 euros.

### §4. Les mesures accessoires

#### 1. L'expertise financière

Bien qu'il soit démontré que Fadi BOUSTANY dispose d'un patrimoine très important, il est impossible à Clara MOUSSA d'évaluer précisément son étendue dès lors qu'il est constitué, à sa connaissance :

- de parts dans des sociétés de droit étranger,
- de trusts
- d'un patrimoine immobilier situé notamment à Monaco et au Liban lequel n'a fait l'objet d'aucune estimation récente et a été acquis par des personnes morales,
- de revenus issus des baux commerciaux et civils établis par les différentes SCI
- d'avoirs et actions détenus sur divers comptes à l'étranger

Dans la mesure où Clara MOUSSA a abandonné sa propre carrière pour se consacrer à sa vie de famille et n'a plus aucune activité professionnelle depuis lors, elle pourra valablement prétendre à l'allocation d'une prestation compensatoire.

Si le principe d'une prestation compensatoire semble acquis et incontestable, le quantum ne pourra être défini que pour autant que le patrimoine de l'époux sera connu.

Clara MOUSSA est à ce titre bien fondée à solliciter la désignation d'un expert judiciaire lequel aura la mission de déterminer les ressources et le patrimoine de chacun des parties depuis leur union.

Le juge en charge du contrôle des expertises sera désigné et devra prendre toutes mesures utiles pour contraindre Fadi BOUSTANY à coopérer.

#### 2. La provision ad litem

Fadi BOUSTANY a organisé depuis de longs mois sa séparation, au mépris de l'environnement affectif et social des enfants, et n'a pas hésité à appeler toutes les personnes de leur entourage pour leur demander de témoigner contre leur mère.

Il a volontairement tout mis en œuvre pour léser son épouse qui pourtant l'a toujours soutenu, et s'est tenue à ses côtés depuis 16 ans.

Il a d'abord essayé de « *négocier* » pour la répudier et la faire disparaitre de sa vie, en la privant de tout droit patrimonial et extrapatrimonial et lui refuser la plus élémentaire transparence, la conduisant à essayer d'avoir des informations.

Il a volontairement transféré des actifs aux Etats Unis, créé des trusts, et instruit un Conseil à Genève, qui initialement indiquait avoir la charge du divorce.

Loin de rechercher avec elle des solutions apaisées, il a multiplié les attitudes inutilement agressives et brutales, refusant même de lui parler jusqu'à son départ aux Etats-Unis, se ruant pour obtenir son éviction dès son départ.

Dans ce contexte particulièrement douloureux, Clara MOUSSA craint que son époux soit animé par une volonté de vindicte et multiplie les manœuvres et les procédures pour à la fois lui nuire mais également tenter de l'asphyxier financièrement.

Or, l'absence de revenus propres de Clara MOUSSA et la fortune de son époux ne doivent pas lui permettre de disposer d'armes de défense inégales dans une guerre qu'il a lui-même initiée.

Clara MOUSSA a ainsi dû organiser sa défense dans l'urgence et devra faire face à d'importantes dépenses pour faire valoir ses droits.

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

Par ailleurs, il doit être précisé que les époux sont anglophones, de sorte que d'importants frais de traduction sont à prévoir, lesquels sont d'ores-et-déjà de plus de 30.000 euros et pourront atteindre le 100.000 à l'issue de la procédure.

De même, parce que Fadi BOUSTANY entretient une certaine opacité sur son patrimoine, une expertise financière devra être ordonnée.

Les diligences de l'expert seront à la hauteur des montages réalisés par Fadi BOUSTANY et seront rendues beaucoup plus complexes par le caractère international pour ne pas dire mondial de son organisation patrimoniale.

Les frais seront avancés par Clara MOUSSA et pourront également atteindre 100.000 euros.

Afin de lui permettre de se défendre dignement, elle est bien fondée à solliciter une provision ad litem à hauteur de 600.000 euros étant précisé qu'elle a déjà exposé des frais conséquents.

**PAR CES MOTIFS**

🔸 **A titre liminaire,**

**Constater** l'absence de fondement juridique et de bienfondé de la demande sur mesures extrêmement provisoires,

En conséquence,

**Débouter** Fadi BOUSTANY de sa demande de mesures extrêmement provisoires,

🔸 **Sur les mesures provisoires,**

**Sur le logement des époux**

**Condamner** Fadi BOUSTANY au paiement d'une somme de € 650.000,00 pour permettre à Madame MOUSSA de se souscrire un contrat de bail immédiatement,

**Sur les mesures concernant les enfants**

**Dire** que l'autorité parentale sera exercée conjointement à l'égard des enfants mineurs,

**Fixer** la résidence des enfants au domicile de Madame MOUSSA,

**Accorder** à Fadi BOUSTANY un droit de visite et d'hébergement, devant s'exercer, en présence de la nourrice des enfants, Madame Aleksandra WISNIEWSKA, sauf meilleur accord des parties :

- o En période scolaire :

  - Une fin de semaine sur deux, du vendredi soir à la sortie des classes au lundi matin au retour de l'école à charge pour le père de les faire chercher les enfants à l'école et de les y faire déposer le lundi matin.

  - Tous les mercredis après-midi, de la sortie des classes jusqu'à 18 heures, à charge pour le père de faire chercher les enfants à l'école et de les faire déposer à leur domicile à 18 heures, et de les faire conduire et récupérer à leurs activités

  - Le jour de la fête des pères

- o En période de vacances scolaires :

  - La moitié des petites vacances scolaires, par alternance chaque année : la première moitié les années paires et la seconde moitié les années impaires pour que les enfants soient avec leurs parents alternativement pour les fêtes de Noël.
  - Durant quinze jours pendant les vacances d'été à charge pour le père d'aviser la mère par tout moyen au moins deux mois à l'avance avec maintien des droits de visite et d'hébergement classiques lorsque la mère n'est pas à l'étranger avec les enfants

19

Citation du 31 octobre 2022
MOUSSA/BOUSTANY
Audience de conciliation du 16 novembre 2022

**Condamner** Fadi BOUSTANY au paiement d'une part contributive à l'entretien des enfants à hauteur de 20.000 euros par mois et par enfant,

**Dire** que la contribution à l'entretien et à l'éducation sera indexée le 1er janvier de chaque année et pour la première fois le 1er janvier 2023 sur l'indice INSEE des prix à la consommation de l'ensemble des ménages hors tabac France entière suivant la formule :

$$\text{Nouvelle contribution} = \text{contribution initiale} \times \frac{\text{nouvel indice}}{\text{Indice de base}}$$

**Dire** que Fadi BOUSTANY prendra à sa charge en sus les frais de scolarité et extrascolaires des enfants,

**Dire** que Fadi BOUSTANY continuera à couvrir les mutuelles et frais médicaux des trois enfants,

### Sur les mesures concernant les époux

**Condamner** Fadi BOUSTANY à régler à Clara MOUSSA une somme de 650.000 euros au titre du devoir de secours afin qu'elle puisse immédiatement se reloger

**Condamner** en outre Fadi BOUSTANY à verser à Clara MOUSSA une pension alimentaire mensuelle de 205.000 euros en exécution du devoir de secours,

### Sur les mesures accessoires

**Désigner** tel expert-comptable qu'il appartiendra avec mission de déterminer l'étendue du patrimoine de Monsieur Fadi BOUSTANY en 2018 et après cette date, avec les pouvoirs d'investigation les plus étendus et notamment lui permettant de procéder à cette évaluation nonobstant l'existence de sociétés écran, de délocalisation des actifs ou encore de placement au sein de trusts, ainsi que de contrôler et chiffer la réalité des dépenses de la famille et de leur train de vie pendant la vie commune, s'adjoindre tout sapiteur de son choix à Monaco mais aussi en Suisse, aux Etats Unis, au Liban et au Luxembourg notamment, aux frais avancés et payés par Fadi BOUSTANY,

**Ordonner** la restitution à Clara MOUSSA de l'ensemble de ses effets personnels notamment habits, son matériel, ses films et souvenirs,

**Condamner** Fadi BOUSTANY à régler à Clara MOUSSA une provision ad litem de € 600.000,00,

**Débouter** Fadi BOUSTANY de ses demandes, fins et conclusions,

**Réserver** les dépens.

**SOUS TOUTES RESERVES**
**Pour la concluante**
Monaco, le 15 novembre 2022

